Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 

 D.H. GINSBURG, Circuit Judge:
 

 Various railroads petition for review of a decision in which the Interstate Commerce Commission determined that 49 U.S.C. § 10741(f), which precludes a claim of discrimination involving “rail rates applicable to different routes,” does not apply to recyclable commodities. We now reverse that decision because it is contrary to the plain and unambiguous language of the law.
 

 I. BackgRound
 

 Section 204 of the Railroad Revitalization and Regulatory Reform (“4-R”) Act of 1976, Pub.L. 94-210, 90 Stat. 31, 40, required the Commission to “investigate the rate structure for the transportation of recyclable or recycled materials and competing virgin material by rail carriers” in order to determine whether it is “unjustly discriminatory or unreasonable.” As part of a recodification in 1978, Congress substituted for the phrase “unjustly discriminatory or unreasonable” references to 49 U.S.C. §§ 10701 and 10741, which prohibited unreasonable and discriminatory rates, respectively.
 
 See
 
 49 U.S.C. § 10731.
 

 Shortly after passage of the 4-R Act, the Commission instituted an investigation into the rate structure for recyclable and virgin materials, from which it concluded that there was no discrimination against recyclables in the rate structure and that relatively few rates for recyclables were unreasonably high.
 
 Investigation of Frt. Rates Recyclable Commodities,
 
 356 I.C.C. 113 (1977). On review, however, we found that the Commission had failed “meaningfully [to] address the focal question presented by its investigation, namely whether the substantial rate disparities between recyclable and virgin products are justified,” and accordingly we remanded the matter for further proceedings.
 
 National Associa
 
 
 *576
 

 tion of Recycling Industries, Inc. v. ICC,
 
 585 F.2d 522, 534 (1978)
 
 (“NARI I”).
 

 On remand, the Commission found that the rate structure did discriminate against recyclables after all; it therefore ordered railroads to “equalize” the ratio of revenues to costs in the transportation of recyclables and in the transportation of virgin products. The Commission also prescribed for recyclables a maximum revenue to variable cost ratio of 180 percent.
 
 Investigation of Frt. Rates Recyclable Commodities,
 
 361 I.C.C. 238 (1979). On petitions for review, we upheld both the Commission’s comparison of revenue-to-cost ratios as a means of determining whether rates are discriminatory, and its finding that there was such discrimination. We again remanded the matter to the Commission, however, because it had failed adequately to justify its selection of the 180 percent ratio and because of our concern that equalization had resulted, in some cases, in an unlawful increase in the rate for transporting recyclables.
 
 National Association of Recycling Industries, Inc. v. ICC,
 
 627 F.2d 1328, 1334-37 (1980)
 
 (“NARI II”), rev’d in part sub nom. Consolidated Rail Corp. v. National Association of Recycling Industries, Inc.,
 
 449 U.S. 609, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981).
 

 Meanwhile, in 1980, with
 
 NARI II
 
 pending in the Supreme Court, Congress enacted the Staggers Act, § 2 of which provided that the maximum lawful rates for the rail transportation of non-ferrous recyclables are those at which the ratio of revenue to variable cost allows the carrier to recover its total operating costs “plus a reasonable and economic profit or return” on its invested capital. 49 U.S.C. § 10731(e). Congress did not enact any special provision for recyclable ferrous materials.
 

 More important for purposes of this petition, the Staggers Act placed certain limitations upon the scope of actionable discrimination by a railroad. Initially, the Act carried forward the historical prohibition on rates that “unreasonably discriminate[ ]” between shippers by charging a different rate “for performing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances.”
 
 Id.
 
 § 10741(a). Section 212 of the Staggers Act limited this provision, however, by providing
 
 inter alia
 
 that it “shall not apply to ... rail rates applicable to different routes.”
 
 Id.
 
 § 10741(f)(4).
 

 Upon reopening its proceedings after our remand in
 
 NARI II,
 
 the Commission tentatively concluded that this provision limiting discrimination claims to situations in which transportation is provided over the same route does not apply to claims involving recyclables.
 
 Investigation of Frt. Rates-Recyclable Commodities,
 
 364 I.C.C. 874 (1981). It later reaffirmed that conclusion in the decision now under review.
 
 Ex Parte No. 319, Investigation of Freight Rates for the Transportation of Recyclable or Recycled Commodities,
 
 5 I.C.C.2d 101, 108-12 (1988). The Commission concluded that, despite the reference to § 10741 in § 10731, “§ 10741 does not apply to individual complaints alleging discrimination against recyclables [because it] would thwart Congress’ overall purpose to promote recyclables movement and, therefore, use.”
 
 Id.
 
 at 111. It explained that because recyclables and the virgin products with which they compete usually travel over different routes, applying the same rate limitation in § 10741 to recyclables would “reverse[] [Congress’s] entire prior legislative agenda by inference.”
 
 Id.
 
 The Commission concluded that since Congress intended, when it passed the Staggers Act, to “strengthen the protection afforded recyclables,”
 
 id.
 
 at 112 n. 15 (“at least the nonferrous variety”), its retention in § 10731 of the reference to § 10741, despite the newly-added limitation upon actionable discrimination contained in the latter provision, was “an oversight.”
 

 The railroads petitioning this court for review of the Commission’s decision contend that the plain language of §§ 10731 and 10741 bars any discrimination claim that involves, in the terms of the latter section, a comparison of “rail rates applicable to different routes.”
 

 
 *577
 
 II. Ripeness
 

 Before discussing the merits of petitioners’ claim, we must address a preliminary question: the ICC contends that the issue before us is not ripe for review at this time. The ripeness doctrine is intended to
 

 prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.
 

 Abbott Laboratories v. Gardner,
 
 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). The first, or fitness, part of the
 
 Abbott Labs
 
 test normally requires us to determine whether the issue is “(a) essentially legal, and (b) ‘sufficiently final.’ ”
 
 International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock,
 
 783 F.2d 237, 249 (D.C.Cir.1986)
 
 (quoting Atlantic Richfield Co. v. United States Department of Energy,
 
 769 F.2d 771, 783 (D.C.Cir.1984)). If we have doubts about the fitness of the issue for judicial resolution, then we balance the institutional interests in postponing review against the hardship to the parties that will result from delay. Where, however, “there are no significant agency or judicial interests militating in favor of delay, [lack of] ‘hardship’ cannot tip the balance against judicial review.”
 
 Askins v. District of Columbia,
 
 877 F.2d 94, 98 (D.C.Cir.1989);
 
 see Consolidation Coal Co. v. Federal Mine Safety & Health Review Comm’n,
 
 824 F.2d 1071, 1081-82 (D.C.Cir.1987).
 
 But see id.
 
 at 1094-96 (D.H. Ginsburg, J., dissenting).
 

 The ICC concedes, as it must, that the issue before us presents “a purely legal question,” a question of statutory interpretation. The ICC also concedes that its ruling, coming as it did at the end of a rule-making proceeding in which it solicited and received public comments, represents the agency’s “ ‘final’ position on the issue.” Despite a rather lame attempt at a reservation (“final,” it says, “at least at this time,”) the Commission makes no pretense that the issue is one for which “further administrative action is needed to clarify the agency’s position, [such as,] for example, when the challenged prescription is discretionary so that it is unclear if, when or how the agency will employ it.”
 
 Action Alliance of Senior Citizens v. Heckler,
 
 789 F.2d 931, 940 (D.C.Cir.1986);
 
 see also Office of Communication of the United Church of Christ v. FCC,
 
 826 F.2d 101, 105 (D.C.Cir.1987). On the contrary, the Commission has made clear “what [it] would likely be looking for in a discrimination case,” 5 I.C.C.2d at 110-11; a complaint of discrimination need not be based upon a comparison between recyclable and virgin products traveling over the same route. The Commission has in no way suggested that its application of this position will somehow depend upon the facts of a specific case.
 

 The ICC nevertheless argues that this matter is not fit for judicial resolution because it is “speculative” and its resolution is likely to prove unnecessary. This is somewhat curious, though. For although the agency did express the hope in its decision that “as the reasonableness ceiling will keep nonferrous recyclables rates relatively low, [it] may never be called upon to engage in a recyclables discrimination inquiry,” it ultimately concluded that the issue now before us was important enough to merit resolution by it; indeed, it implicitly invited precisely the type of discrimination suit that it now claims is a thing of the past.
 
 Id.
 
 at 110 & n. 14 (“Particularly in light of the fact that we are not initiating a broad discrimination inquiry, in our view individual discrimination complaints are not barred_”). For the agency to claim now that the issue may never arise is therefore not convincing.
 

 In light of our conclusion that this matter is clearly fit to be heard, we need not consider whether petitioners would suffer any hardship from our postponing its reso
 
 *578
 
 lution. Even if we believed that no such hardship would result, the Commission’s concession that its decision is “purely legal,” and our finding that it is effectively as well as formally “final,” would lead us to conclude that it is ripe for review.
 

 III. Merits
 

 Since we review here the Commission’s construction of a statute that it is charged with implementing, our scope is limited, in accordance with
 
 Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
 
 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984).
 
 See Brotherhood of Railway Carmen v. ICC,
 
 880 F.2d 562, 567 (D.C.Cir.1989). We must first determine, “based upon the language of the statute and the ‘traditional tools of statutory construction,’ ”
 
 id. (quoting Chevron,
 
 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9), “whether Congress has directly spoken to the precise question at issue,”
 
 Chevron,
 
 467 U.S. at 842, 104 S.Ct. at 2781. Only if we are thereby unable to discern Congress’ intent with respect to “the precise question at issue” do we proceed to
 
 Chevron’s
 
 second stage: a determination “whether the agency’s answer is based on a permissible construction of the statute.”
 
 Id.
 
 at 843, 104 S.Ct. at 2781. In this case, however, our inquiry ends with the first stage of the
 
 Chevron
 
 analysis because Congress has directly spoken, in §§ 10731 and 10741, to the issue raised.
 

 Section 10731, under which discrimination complaints involving recyclables are brought, requires the Commission to “determine whether [a] rate increase[] affect[s] any part of the rate structure in violation of section 10701 or 10741.” As we have seen, § 10741, which defines unreasonable discrimination, excludes from that concept disparities between “rates applicable to different routes.” It is therefore beyond our comprehension how one can read §§ 10731 and 10741 together to mean that § 10731 prohibits discrimination in the provision of transportation over different routes.
 

 Despite the clear meaning of these specific provisions, the ICC urges us to infer from Congress’s general desire to encourage the use of recyclables that the legislature simply goofed when, having limited § 10741 to same-route situations, it failed to delete the reference to that section from § 10731. (“Since Congress intended discrimination investigations to continue,” argues the Commission, “it must have overlooked Section 10731’s reference to Section 10741....”) Faced with clear statutory language, uncontradicted by anything in the legislative history, we cannot so blithely infer that Congress has erred. For we must never forget that it is a statute we are expounding, and it is the intention of the drafters, as expressed in the words they used, that we must heed.
 

 As the Supreme Court has explained, “[t]he plain meaning of legislation should be conclusive, except in the ‘rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.’ ”
 
 United States v. Ron Pair Enterprises, Inc.,
 
 — U.S. -, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989)
 
 (quoting Griffin v. Oceanic Contractors, Inc.,
 
 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). And that “rare case” must involve, at a minimum, some clear indication of congressional intent, either in the legislative history or in the structure of the relevant statute, that informs the specific language in question; any attempt less grounded in the words of the legislature itself to further what a court perceives to be Congress’s general goal in enacting a statute is simply too susceptible to error to be tolerated within our scheme of separated powers.
 
 Cf. American Medical Association v. United States,
 
 317 U.S. 519, 535, 63 S.Ct. 326, 331, 87 L.Ed. 434 (1943) (“it is not our province to define the purpose of Congress apart from what it has said in its enactments”).
 

 For this reason, courts have developed a number of norms of statutory construction that both draw upon and bolster the essential presumption that Congress, although not infallible in communicating its intentions clearly, at least knows the legal context in which it acts and does not commit
 
 *579
 
 oversights: thus, for example, we “assume that Congress intended that language which it chose to employ actually was to have meaning,”
 
 United States v. McGoff,
 
 831 F.2d 1071, 1080 (D.C.Cir.1987); “effect must be given, if possible, to every word, clause and sentence of a statute ... so that no part will be inoperative or superfluous, void or insignificant.”
 
 National Association of Recycling Industries, Inc. v. ICC,
 
 660 F.2d 795, 799 (D.C.Cir.1981) (citations omitted); and so on.
 

 In these rules, we courts assume that Congress always knows the particulars whereof it speaks; we do not assert that as an empirical fact, for we all understand, as Horace said, that “sometimes even excellent Homer nods.” We hold to this course, however, because there is no other less dangerous way; if courts were free to “correct” what they believe to be congressional oversights by construing unambiguous statutes to the contrary of their plain meaning — apart from that rare case in which specific legislative history compels such a result — even a good faith attempt to further Congress’s goals would open the way to judicial hijacking of the power to legislate.
 
 Compare Friedrich v. City of Chicago,
 
 888 F.2d 511, 514 (7th Cir.1989) (Because “legislatures ... often legislate in haste, ... it is not usurpation ... for the court to complete (not enlarge) the statute by reading it to bring about the end that the legislators would have specified had they thought about it more clearly or used a more perspicuous form of words.”).
 

 In light of the necessary presumption of congressional omni-competence, we are unable to uphold the Commission’s interpretation in this case. The ICC has pointed to nothing specific in the legislative history that indicates that Congress, when it enacted the same-route limitation in § 10741, did not mean for it to apply to recyclables. The ICC contends that Congress’s retention of the reference to § 10701 in § 10731 is just such an indication because the Staggers Act made § 10701 inapplicable to rail rates; in other words, the Commission tries to show that Congress erred in another regard in order to argue from the precedent that it erred in the way that is at issue here. Even if we are to assume that the ICC’s representation regarding § 10701 is correct, however, and that the reference to it in § 10731 has no real-world application after the change wrought by the Staggers Act, we still would not think that relevant to the matter before us. The unavoidable fact is that Congress retained the reference to § 10741, which had been inserted in 1978, when it passed the Staggers Act in 1980; indeed the ICC concedes that “Congress was aware of Section 10731 when it enacted the Staggers Act, as shown by its amendment of [another] provision” thereof. It would therefore be a blatant act of revision for us to say that Congress did not mean what it said when it added the same-route limitation to § 10741. Although Congress may indeed have intended to promote the use of recyclables when it passed the Staggers Act, we cannot ignore clear statutory language whenever an opportunity presents itself to promote that goal; our job is to interpret the methods that Congress chose to further its goals, not to devise methods of our own.
 

 Finally, we are unpersuaded by the ICC’s. contention that applying the same-route limitation of § 10741 to recyclables will render § 10731, through which Congress sought to promote the use of recyclables, a “virtual nullity” because “[m]ost recyclable-virgin commodity pairs move over different routes.” The Commission appeals to the rule of construction, which we mentioned earlier, that every part of a statute should be given effect. It is enough, however, that each term of the statute have a logical role to play in the scheme of the law; we cannot reject a facial reading of the statute because that role is not as great as it could be under another reading that finds no support in the text.
 

 IV. Conclusion
 

 The meaning of §§ 10731 and 10741, with respect to the issue before us, is susceptible to only one interpretation; consequently, our function is merely to “give effect to the unambiguously expressed intent of
 
 *580
 
 Congress.”
 
 Chevron,
 
 467 U.S. at 843, 104 S.Ct. at 2782. The Commission having interpreted those provisions contrary to their clear meaning, its decision is hereby
 
 Reversed.