**ABBOTT LABORATORIES, Appellant,**

v.

**Frank D. YOUNG, Dr., Commissioner, Food and Drug Administration.**

**Nos. 89–5183, 88–5260.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 7, 1990.

Decided Dec. 7, 1990.

---

Harold D. Murry, Jr., with whom Robert P. Reznick was on the brief, for appellant. Bryan Jay Yolles, Washington, D.C., also entered an appearance, for appellant.

Irene M. Solet, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Anthony J. Steinmeyer, Washington, D.C., Atty., Dept. of Justice, were on the brief, for appellee. Jacqueline H. Eagle, Atty., Rockville, Md., Dept. of Justice, also entered an appearance, for appellee.

Peter R. Mathers, Washington, D.C., for amicus curiae Par Pharmaceutical, Inc., urging affirmance.

Before MIKVA, EDWARDS, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting Opinion filed by Circuit Judge EDWARDS.

SILBERMAN, Circuit Judge:

This is an unusual case in which both the appellant and the government present us with unreasonable interpretations of a statute we think ambiguous. We therefore direct the district court to remand to the agency for reconsideration.

## I.

In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984) (the "Hatch–Waxman Amendments"), amending the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301–392. The statute created a new system for protecting both the interests of drug manufacturers who produce new drugs and the interests of generic drug manufacturers and their consumers. Facing the classic question of the appropriate trade-off between greater incentives for the invention of new products and greater affordability of those products, Congress struck a balance between expediting generic drug applications and protecting the interests of the original drug manufacturers. *See* H.R. REP. No. 98–857 (Pt. 1), 98th Cong., 2d Sess. 14, 15, *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS 2647, 2648. It reserved a longer period of market exclusivity for newly developed drugs than for drugs for which the approval process had already been completed in a prior application. The statute gives the original drug producer a specified period of market exclusivity depending primarily on the pharmaceutical novelty of a drug.

This case requires us to determine the scope of the exclusivity provisions, in particular the meaning of the phrase "active ingredient (including any ester or salt of the active ingredient)." 21 U.S.C. § 355(j)(4)(D)(i) and (v). The full statutory language is set out in the margin, but the key parts of the two relevant subsections of the statute state that a two year exclu-

sivity period attaches to a drug whose new drug application ("NDA") "includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another [NDA]," 21 U.S.C. § 355(j)(4)(D)(v) and a ten year exclusivity period attaches to a drug whose NDA has "no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other [NDA]," 21 U.S.C. § 355(j)(4)(D)(i).[1] Congress thereby sought to encourage innovation in the drug industry, by rewarding a pioneer drug with a ten year exclusivity, while protecting consumers from unduly high prices by refusing to give a long period of market exclusivity to drugs which required no new research effort.

In 1978 the Food and Drug Administration ("FDA") approved for marketing Abbott Laboratories' ("Abbott") new drug application for Depakene, an anticonvulsant drug prescribed for control of epileptic and other seizures. The chemical ingredient of Depakene that performs the drug's therapeutic function is valproic acid. Valproic acid is both an "active ingredient" (the substance prior to introduction into the human body) and an "active moiety" (the substance that creates the actual therapeutic effect within the body). In 1982, the FDA approved Abbott's new drug application ("NDA") for another drug, Depakote, also prescribed for control of seizures. In its Depakote NDA, Abbott relied exclusively on the safety and efficacy findings established in the course of the prior Depakene application, because the "active moiety" of Depakote was the very same valproic acid. Depakote's active ingredient, we are told, is divalproex sodium which is converted into the valproic acid within the human body. Apparently divalproex sodium presents fewer gastrointestinal side effects than the valproic acid. Although the issue was disputed, the agency found divalproex sodium to be a salt of valproic acid.[2] In simple terms, a salt is a chemical compound created when the "parent" substance reacts with another chemical. A salt is "formed when the hydrogen of an acid is replaced by a metal or its equivalent." *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 393 n. 3 (Fed.Cir.1990), *citing The Condensed Chemical Dictionary* 907 (G. Hawley rev. 10th ed. 1981). FDA determined that Depakote could only be granted a two year period of market exclusivity pursuant to the statute because it was a salt of the active ingredient of the prior-approved Depakene. On August 29, 1986 Abbott sub-

---

**1.** If an application (other than an abbreviated new drug application) submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of *the* active ingredient) *of which* has been approved in any other application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted effective before the expiration of ten years from the date of the approval of the application under subsection (b) of this section.

> (v) If an application (or supplement to an application) submitted under subsection (b) of this section for a drug, *which* includes an active ingredient (including any ester or salt of the active ingredient) *that* has been approved in another application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection which refers

to the drug for which the subsection (b) application was submitted or which refers to a change approved in a supplement to the subsection (b) application effective before the expiration of two years from September 24, 1984.

21 U.S.C. § 355(j)(4)(D)(i) and (v) (emphases added).

Both (D)(i) and (D)(v) apply to the transition period under the statute, from January 1, 1982 to September 24, 1984, during which the ten year and two year exclusivity periods apply. Sections (D)(ii), (iii), and (iv) control the applicable exclusivity periods after September 24, 1984. Because the instant case arose during the transition period, only (D)(i) and (D)(v) are at issue here. We note that the same language is used for determining the applicable periods of exclusivity for drugs introduced after September 24, 1984—the only difference in the statutory scheme is the length of the exclusivity periods.

**2.** The FDA based its decision about the chemical relationship between Depakote and Depakene in part on an affidavit submitted by Dr. Robert H. Wood, of which Abbott was not given notice.

mitted a Citizen Petition to the FDA pursuant to 21 C.F.R. § 10.30 requesting a ten year exclusivity. The FDA denied Abbott's petition, *Abbott Labs,* Docket No. 86P-0367 (FDA February 11, 1988), and Abbott filed a suit in the district court. It appeals from a judgment below which affirmed the agency decision. *Abbott Labs. v. Young,* 691 F.Supp. 462 (D.D.C.1988).

## II.

Pursuant to the Supreme Court's guidance in *Chevron,* we must first determine whether Congress manifested an "unambiguously expressed intent" that resolves this dispute over the statute's meaning. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Of course, the language of the statute itself is always the best indication of congressional intent. Abbott argues, with the support of the Federal Circuit, that the "plain meaning" of the language supports its interpretation. Both Abbott and the Federal Circuit, *see Glaxo,* 894 F.2d at 393–94, focus only on the phrase "active ingredient," claiming it has a well understood meaning. The district court, on the other hand, thought that the usage of the reference words "which," "of which," and "that" in sections (i) and (v) created an overlap and therefore an irreconcilable conflict between the sections because the same active ingredient was ostensibly covered by both provisions, resulting in different periods of exclusivity mandated for the same substance. *See* 691 F.Supp. at 472. The government disavows the district judge's perceived irreconcilable conflict.[3] Instead, the government reads the parenthetical phrase ("including any ester or salt of the active ingredient") to permit an interpretation of "active ingredient" that includes even more than salt or ester derivatives. According to the government, that phrase can be interpreted to mean that Congress was using the term active ingredient loosely, possibly as a virtual synonym for active moiety.

Indeed, it was at least suggested in an agency letter, subsequent to the decision in Abbott's case, that the phrase "active ingredient" itself, even without the parenthetical, could be interpreted to include active moiety notwithstanding that the FDA construes that term narrowly in another section of the act, 335(j)(4)(D). *See McNeil Pharmaceutical* 6, Docket No. 87P-0339 (FDA July 26, 1989). The agency appears to contend that the different purpose of that other section 335(j)(4)(D) (providing for expedited approval of generic drugs so agency caution is indicated) justifies a different interpretation of the same phrase. We note that it is not impermissible under *Chevron* for an agency to interpret an imprecise term differently in two separate sections of a statute which have different purposes. *See National Ass'n of Casualty and Surety Agents v. Board of Governors of the Fed. Reserve Sys.,* 856 F.2d 282, 287 (D.C.Cir.1988) (upholding different agency interpretations of same phrase when based on reasonable explanation), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989); *Comite Pro Rescate v. Sewer Auth.,* 888 F.2d 180, 187 (1st Cir.1989) (same), *cert. denied,* — U.S. ——, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990). But we cannot consider whether active ingredient is such a term because the agency did not in its decision on Abbott's application employ this theory.

Putting aside for a moment the relative merits of the various constructions offered, we first conclude the language is ambiguous as it relates to the issue before us. The parenthetical phrase ("including any ester or salt of *the* active ingredient") can refer to *either* the active ingredient of the original approved drug *or* to the active ingredient in the new drug, depending on how "the" in the parenthetical and the words surrounding the parenthetical—"no active ingredient ... of which has been approved"—is interpreted. In other words, the definition of an active ingredient as including both the active ingredient and an ester or salt of *the* active ingredient can

---

3. Of course the district judge's construction of the statute is not entitled to deference as is the agency's—if the agency's interpretation meets the *Chevron* standard.

refer *both* to the active ingredient in the earlier and the· later drug application, which would be the proper reading if Congress had in mind, as it seems to have had, that an active ingredient was to be regarded for purpose of this portion of the statute as equivalent to an ester or salt of itself.

In this section of the Act, Congress was concerned with defining the chemical entity on which a subsection (j) (generic drug) application is based.[4] When Congress used the definition "*an* active ingredient (or the salt or ester of *the* active ingredient)," § 355(j)(4)(D)(v) (emphasis added), that definition arguably referred to *all* the subsection (b) applications in question. The FDA's authorization to approve a generic drug (subsection (j) application) depends on its relationship to all original drugs (subsection (b) applications). Therefore, Congress may have intended for its definition —"*an* active ingredient (including any salt or ester of *the* active ingredient)," § 355(j)(4)(D)(v)—to refer to the universe of all subsection (b) applications. Thus, the ambiguity of reference in the phrase reflects the possibility that it can refer to the latest subsection (b) application as well as all prior subsection (b) applications. Although our dissenting colleague asserts the language has a plain meaning, he does not explain why we are incorrect in perceiving this ambiguity.[5]

### III.

■ Since we have discovered nothing in the legislative history that could be thought to embody the express intent that the language does not yield, we pass on to the second step of *Chevron* and ask whether the government's construction falls within the bounds of reasonableness. We think it does not—at least its primary argument presented before us does not. The "reasonableness" of an agency's construction depends on the construction's "fit" with the statutory language as well as its conformity to statutory purposes. We cannot agree with the government's unconvincing attempts to employ the "including" clause to cover all possible permutations of active ingredient. This case differs from instances where an "including" clause is designed to merely illustrate a few examples of the general category, *see, e.g., Puerto Rico Maritime Shipping Auth. v. ICC,* 645 F.2d 1102, 1112 n. 26 (D.C.Cir. 1981). It is simply not plausible to read "including any salt or ester" as merely illustrative, to mean including *any* form that eventually produces the same active moiety. In other words, we reject the government's interpretation as *linguistically* infeasible even though logically possible.

■ Once we reject the agency's interpretation of the statute as unreasonable it does not follow that appellant's competing construction must be adopted. Even if we thought appellant's interpretation were reasonable we could not accept it if we perceived still other possible reasonable constructions. It is, after all, for the agency to make the choice between such alternatives. But in this case we do not believe Abbott's suggested interpretation *is* reasonable.

Abbott argues that even if divalproex sodium is a salt of valproic acid,[6] the stat-

---

**4.** Subsection (b) applications are new drug applications for original drugs, while subsection (j) applications are generic drug applications which face reduced barriers to FDA approval. The length of market exclusivity simply determines *when* a subsection (j) application is allowed, which is determined by reference by the new drug application for original drugs, *i.e.,* subsection (b) applications.

**5.** We note that the Act includes other ambiguities hinging on unclear references. *See Eli Lilly & Co. v. Medtronic, Inc.,* —— U.S. ——, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990) (structurally unclear whether "a Federal law which regulates the manufacture, use, or sale of drugs" applies to individual provisions regulating drugs or to the entirety of any Act which has parts regulating drugs). In that case the Court had to pick its way between a more natural reading that yielded an implausible meaning, and an interpretation that gave the unclear phrase "a meaning it simply will not bear." *Id.* 110 S.Ct. at 2687.

**6.** The FDA found that the divalproex sodium is a salt of valproic acid but Abbott continues to deny it. This is partly a substantive chemical question and partly a procedural issue—whether the agency improperly relied on an affidavit

ute precludes the FDA from treating the two chemicals as the same active ingredient because of the sequence of applications. To be sure, Abbott's interpretation, at first reading, is the more obvious linguistic construction of the statute—that active ingredient refers in this case to divalproex sodium. The parenthetical phrase ("including any ester or salt of the active ingredient"), according to Abbott, refers only to the original drug, the active ingredient "of which has been approved."

█ Abbott's interpretation then, unlike the FDA's, is possible linguistically but fails to serve any conceivable statutory purpose. It would mean that if an original drug application has an active ingredient in the form of a salt, a drug company cannot obtain extended protection by merely filing a new application for a drug with an active ingredient in its non-salt form, but if it does the reverse, as in this case, it can. That construction appears to be farfetched because it is not consistent with any legislative goal: Abbott can advance no hypothetical reason why Congress (or indeed any of the interest groups) would have wanted the degree of protection a drug received to turn on this variable sequence.[7] Abbott's reading promotes neither the interests of the research-oriented pharmaceutical industry nor the generic drug industry in a rational way, producing instead a windfall depending on an accident of chemical nomenclature. We have not been offered *any* scientific, technical, economic or other explanation why Congress would intend the grant of a ten year market exclusivity to depend on the temporal sequence in which subsection (b) applications were approved and the counsel could not suggest any when pressed on this point. It appears, then, entirely serendipitous that in this case Abbott sought an application for the salt of valproic acid after *first* applying for

valproic acid. Thus, under Abbott's interpretation, if a pharmaceutical manufacturer developed two usable drugs, one a salt of the other, he could gain extra protection by applying for approval of the acid first, followed by the salt, but not under the reverse sequence.

If Congress truly intended the sequential distinction that Abbott urges, it would have drafted (it would have *had* to draft) quite different language in a different structure such as

> If an application submitted under subsection (b) of this section is for a drug which contains an active ingredient that is also contained in a previously approved drug, then.... For purposes of this section an active ingredient in the previously approved drug includes an ester or salt of an active ingredient in the previously approved drug, but in the event that an ester or salt of the original active ingredient is filed as an active ingredient of the subsequent NDA, there is no disqualification.

█ That Abbott's interpretation passes first reading suggests to us that Congress did not focus on the reverse sequence of application; not that it intended to address a sequential distinction. Ambiguity of language typically appears when the draftsman does not have in mind the manner in which the norm set forth in the statute will apply to a particular situation. We think that occurred here; Congress did not directly address the "precise question at issue," *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, and therefore the FDA (not the judiciary) is entitled to place its reasonable construction on the ambiguous statute.

\* \* \* \* \* \*

Accordingly, we remand this case to the district court with instructions, in turn, to remand to the agency. We hold only that

---

not brought to the attention of Abbott. Since we are remanding in any event to give the agency an opportunity to parse the language of the statute again, the agency might choose to adopt a procedure that would obviate any need for us to consider the affidavit issue if it remains relevant to the agency's decision.

7. Abbott's brief did refer to a district judge's speculation that deriving ester or salt from an acid requires a greater effort than the reverse process, *see Glaxo Operations UK Ltd. v. Quigg*, 706 F.Supp. 1224, 1229–30 n. 12 (E.D.Va.1989), *aff'd*, 894 F.2d 392 (Fed.Cir.1990), but the district court offered no support for that notion and at oral argument Abbott's counsel, when asked, did not put forth that hypothesis.

the statute is ambiguous; the reliance the government places on the including clause is an unreasonable construction and that Abbott's interpretation of the statute is also unreasonable. Beyond that, we may not proceed since we have no authority to place a construction on the statute that the agency has not offered.

HARRY T. EDWARDS, Circuit Judge, dissenting:

PROLOGUE

This is a bizarre case: Every reasonable consideration furnishing a basis for judgment favors the appellant; yet, the majority cannot bring itself to reach the result that is compelled by the record before it.

We reject the decision of the District Court, for it fails to comport with the terms of the statute.... We also recognize that the FDA—the agency to which we owe deference if this case is analyzed under "step two" of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—does not subscribe to the rationale underlying the District Court's decision.... We also reject the FDA's interpretation, because it, too, is at odds with the language of the statute and does not otherwise reflect a permissible reading of the disputed legislation.... We agree with the District Court that Abbott's interpretation *is* supported by the plain language of the statute, although the majority finds this result unpalatable.... And, finally, our decision today is in direct conflict with a judgment of a sister circuit. *See Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 395 (Fed.Cir.1990).

Despite all of the foregoing, the majority has decided to remand this case to the agency to give it another shot at the issue. This makes no sense to me.

---

In 1978, the Food and Drug Administration ("FDA") approved a new anticonvulsant drug, called "Depakene," that had been developed by the appellant, Abbott Laboratories ("Abbott"). Depakene was effective in controlling seizures but caused harmful gastrointestinal side-effects in some patients. To avoid these side-effects, Abbott subsequently developed a new drug, called "Depakote," which was also effective in controlling seizures but which used a different "active ingredient" that was less prone to irritating patients' digestive tracts. Thus, although the two drugs bear chemical similarities, Depakote represents a significant improvement over the earlier drug.

Abbott filed a new drug application for approval to market Depakote in December of 1981. The FDA approved the new drug on March 10, 1983. Thereafter, on September 24, 1984, Congress passed the Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984) (the "Act" or "the Hatch–Waxman Amendments"), which was intended to allow a manufacturer to obtain approval to market a drug without performing clinical tests normally required to support a full new drug application and, also, to provide market exclusivity for innovative drugs approved by the FDA. Under Title I of the Act, there are five categories of drugs eligible for varying periods of market exclusivity ranging from two years to 10 years. Relying on 21 U.S.C. § 355(j)(4)(D)(i) (hereinafter "subsection (i)"), which applies to drugs approved by the FDA between January 1, 1982, and September 24, 1984, Abbott sought 10 years of market exclusivity for Depakote.

Subsection (i) applies to "a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application"; and Abbott claimed that the prior approval of Depakene did not bar 10–year exclusivity for Depakote, because the "active ingredient" for the two drugs is different and because the latter drug's active ingredient (including any ester or salt of it) had never before been approved by the FDA. The FDA rejected this claim, applying instead the two-year market exclusivity protection of 21 U.S.C. § 355(j)(4)(D)(v) (hereinafter "subsection (v)"), because Depakene and Depakote "shared the same active moiety." Brief for Appellee at 9. In other words,

the FDA ignored the literal terms of the statute (focusing on "active moiety" in place of "active ingredient"), because, in the agency's view, Congress intended "to provide the maximum period of market protection only to the most innovative drugs which require the largest expenditure of resources to develop." *Id.* at 14. The agency concedes that "active ingredient" and "active moiety" are not the same; and the agency can point to no statutory provision supporting the gloss that it has placed on subsection (i).

The majority, while shunning the FDA's statutory construction, agrees with the conclusion that Depakote should obtain only the shorter, two-year period of market protection. In reaching this judgment, the majority, like the FDA, ignores the plain meaning of the statute because it believes that, if enforced as written, the statute would produce arbitrary results. I dissent because I believe the majority's conclusion is based on largely groundless conjecture, and because it is our task as judges to apply the statute as it is written, not as we think it ought to have been written.

## I.

As the majority correctly notes, the Hatch–Waxman Amendments were the product of compromise. The Act emerged from Congress' efforts to balance two conflicting policy objectives: to induce name-brand pharmaceutical firms to make the investments necessary to research and develop new drug products, while simultaneously enabling competitors to bring cheaper, generic copies of those drugs to market. *See Mead Johnson Pharmaceutical Group v. Bowen*, 838 F.2d 1332, 1333 (D.C.Cir.1988); H.R.Rep. No. 857, 98th Cong., 2d Sess., pt. 1, at 14–15, *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS 2647, 2647–48. The statutory provisions directly at issue here reflect one of the

incentives Congress held out to name-brand pharmaceutical concerns in the trade-off, namely, market exclusivity for the pioneer drugs they bring to market. During the period of market exclusivity, the FDA will withhold approval of any generic copy.

In assessing the applicability of subsection (i) (the 10–year provision) versus subsection (v) (the two-year provision),[1] the critical question is whether the new drug for which market exclusivity is sought contains an "active ingredient (including any ester or salt of the active ingredient)" that has been previously approved by the FDA. *See* 21 U.S.C. §§ 355(j)(4)(D)(i) & (v) (1988). If the new drug's "active ingredient (including any ester or salt of the active ingredient)" *has* been previously approved by the FDA, then the new drug is entitled only to two years' protection under subsection (v); if it *has not*, then the drug may claim the full 10–year period of market exclusivity under subsection (i), the rationale being that the drug likely represents a more significant innovation.

All parties agree that Depakote, the drug for which Abbott seeks market exclusivity, bears many similarities to Abbott's previously approved Depakene. Both drugs are prescribed to control seizures and both do so by way of a common "active moiety," *i.e.*, the pharmacologically significant agent that actually accomplishes the intended therapeutic effect in the human body. The "active moiety" for both Depakote and Depakene is a substance known as valproic acid. The chief innovative development in Depakote is a modification of Depakene's initial dosage form, *i.e.*, its "active ingredient," that avoids undesirable side-effects associated with Depakene. Depakene uses valproic acid as its "active ingredient"—in effect introducing the "active moiety" directly into the body. This approach was effective in controlling seizures but resulted in gastrointestinal side-effects, leading

---

1. Subsection (i) and subsection (v), at issue here, apply only to new drugs approved by the FDA during a transitional "window" from January 1, 1982, through September 24, 1984. Drugs approved after September 24, 1984, are entitled to generally shorter periods of market exclusivity under subsections (ii), (iii) and (iv) of 21 U.S.C. § 355(j)(4)(D) (1988). Abbott's Depakote, the drug whose claim to market exclusivity is contested in this action, was approved on March 10, 1983, and its right to market protection is therefore governed by either subsection (i) or subsection (v) of the Act.

Abbott to develop Depakote. Depakote uses a different substance, known as divalproex sodium, as its active ingredient. Divalproex sodium avoids the side-effects associated with the direct ingestion of valproic acid. Once divalproex sodium is ingested, however, the body converts it into valproic acid, which then accomplishes the intended effect of controlling seizures.

Although valproic acid was previously approved in Abbott's earlier application for Depakene, it is conceded by all parties that neither divalproex sodium nor any salt or ester of divalproex sodium had ever been previously approved by the FDA.

Abbott sought the maximum, 10-year period of market exclusivity under the statute based on the fact that neither the active ingredient of its new drug (divalproex sodium) nor any salt or ester of that active ingredient had ever before won FDA approval. The FDA concluded, however, that Depakote was entitled only to two years' market exclusivity. It justified this conclusion by a rather far-fetched reading of the statute: by using the word "including" in the statute, the agency argued, Congress meant to introduce an illustrative list of the sorts of chemical derivations of an active ingredient that, if previously approved, would deprive a new drug of the maximum, 10-year protection. The FDA was thus entitled, the argument goes, to insert the term "active moiety" into the statutory scheme in order to effectuate the alleged broader intentions of Congress to distinguish between drugs that represented entirely new chemical entities and those that were derivations of previously approved entities. By this reading, Depakote would be entitled to only two years' protection because its active moiety (valproic acid) had been previously approved in Depakene.

## II.

I agree with the majority that the FDA's reading of the statute, which turns entirely on a purported ambiguity or implied delegation in the word "including," is implausible and must be rejected. I also agree with the majority that the reading offered by the District Court, which concluded that there is an irreconcilable conflict between the two obviously complementary statutory provisions, must also be rejected. I disagree, however, with the majority's discovery of a new purported ambiguity in the statute, a discovery it uses to justify a remand to the FDA (along with a strong hint about how the agency should construe subsections (i) and (v)). Rather, I believe this case is properly resolved at the first step of the familiar *Chevron* doctrine, under which the court must adhere to the clear intention of Congress expressed on the face of the statute. *See Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

The parties are in agreement that the terms used by the statute—active ingredient, salt and ester—have plain and established meanings in scientific and regulatory parlance. *See Glaxo Operations UK Ltd. v. Quigg,* 894 F.2d 392, 395 (Fed.Cir.1990). The only ambiguity asserted by the FDA pertains to the statute's use of the word "including," a claim this court properly dismisses. Thus, by the plain terms of the statute, Abbott's Depakote is entitled to 10 years of market exclusivity because the FDA had never previously approved Depakote's active ingredient (divalproex sodium) or any salt or ester of that ingredient.

The majority rejects the literal terms of the Act, not because the statutory language is actually ambiguous, but rather because it fears that applying the statute as written might produce arbitrary results. Although the majority acknowledges that Abbott's interpretation of the statute is the more obvious one, it rejects this view as whimsical because of the supposed ability of a drug manufacturer to manipulate the length of market exclusivity it obtains under the statute by altering the sequence in which it markets certain drugs. For example, it is conceded that if Abbott had invented and won FDA approval for Depakote *before* it invented Depakene, the latter drug would be entitled only to two years' protection. This is because divalproex sodium, arguably a salt of Depakene's active ingredient, valproic acid, would then have

been previously approved by the FDA, pushing the second drug into the compass of subsection (v). By reversing the order in which Government approval is sought, however, the manufacturer could obtain 10 years' protection for both drugs under Abbott's "plain language" reading of the statute. Such a result could not have been within Congress' intention, the majority concludes, and the statute's plain meaning must therefore be ignored.

There are at least two answers to the majority's argument. First, we have no basis for knowing whether it would be scientifically plausible to reverse the order of pharmaceutical invention in a case of this sort, or economically feasible to reverse the order in which Government approval is sought. Intuition suggests that a "derivative" drug is likely to be invented *after* the "parent" drug, rather than the other way around. Indeed, it would seem capricious, even absurd, for a pharmaceutical company to develop and attempt to market a drug (like Depakene) with harmful side-effects *subsequent to* the development of a better drug (like Depakote) that avoided those side-effects. And in this case there is clearly no danger that Abbott orchestrated its new drug applications to exploit the statute given that the statutory provisions at issue here apply only retrospectively to conduct that occurred before the statute was enacted.

Furthermore, and more to the point, the parties offered no evidence either to sup-

port or refute the majority's hypothesis. There is simply no basis in the record for the majority's blithe assumption that it is entirely serendipitous that Abbott invented Depakene before Depakote. I am loath to ignore the plain words of Congress based upon a counterintuitive supposition that is apparently groundless.

Second, even if the sequence of invention and approval could be manipulated to the manufacturer's advantage, there is nothing so outrageous about such a result to justify the majority's refusal to enforce the statute as Congress wrote it. While it is true that "a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute," *Bob Jones Univ. v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983), the Supreme Court ordinarily applies this canon only where it is clear that adherence to a statute's literal terms would produce a result flagrantly at odds with legislative purpose.[2] The result that would ensue from literal application of the market exclusivity provisions—granting the maximum economic reward to a drug that had to endure less than a maximum amount of regulatory delay and expense—does not seem likely to "defeat the plain purpose" of the statute, which was, after all, to strike a rough compromise between accelerating generic entry into the market and providing sufficient economic incentives for continued name-brand innovation.

---

2. In *Bob Jones*, for example, the Court upheld an IRS interpretive ruling that restricted tax-exempt status only to "charitable" institutions even though the relevant statute contained no such literal restriction. The Court held that it was proper for the IRS to depart from the "plain language" of the statute where strict application of that language would provide governmental aid to an organization that was itself at odds with "a most fundamental national public policy" of racial equality. 461 U.S. at 593, 103 S.Ct. at 2029. The Court in that case found "unmistakable evidence that, underlying all relevant parts of the Code, is the intent that entitlement to tax exemption depends on meeting certain common-law standards of charity—namely, that an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy." *Id.* at 586, 103 S.Ct. at 2025.

In a more recent case, *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989), the Court upheld a non-literal interpretation of Rule 609(a)(1) of the Federal Rules of Evidence where a strictly literal approach would lead to "an unthinkable disposition" and might render the Rule unconstitutional. *See id.* 109 S.Ct. at 1994 (Scalia, J., concurring in the judgment).

In *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), the Court rejected a literal application of a statute that would have led to the "outlandish" conclusion that Members of Congress had intended to "subject[ ] their own political parties to bureaucratic intrusion and public oversight." *Id.*, 109 S.Ct. at 2566 n. 9.

That a statute yields a somewhat anomalous result does not mean that Congress could not have intended it. Many statutes, being products of innumerable and sometimes hasty and pragmatic compromises, permit seemingly arbitrary results. *See Board of Governors of the Federal Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986). That fact is not cause, however, for rewriting them either in the agencies or in the courts. *See id.* Contrary to the tenor of the majority's analysis, Congress is not subject to the "arbitrary and capricious" constraints of the Administrative Procedure Act when it drafts and enacts statutes; and courts are not free to withhold enforcement of congressional enactments merely because they seem arbitrary or anomalous. *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 n. 9, 103 S.Ct. 2856, 2866 n. 9, 77 L.Ed.2d 443 (1983) (presumption of rationality accorded a statute is much greater than presumption of regularity accorded an agency action).

The majority labors mightily to discover a possible ambiguity in the statute in order to justify its refusal to adhere to the plain meaning of Congress' words. It concedes that Abbott's is the more obvious construction of the actual language used in the statute, but finds that reading unpalatable because of its suspicion that "Congress did not focus on the reverse sequence" problem. Judicial tinkering with statutes in order to correct suspected congressional oversights is, however, a dangerous business:

> In these rules [of statutory interpretation], we courts assume that Congress always knows the particulars whereof it speaks; we do not assert that as an empirical fact, for we all understand, as Horace said, that "sometimes even excellent Homer nods." We hold to this course, however, because there is no other less dangerous way; if courts were free to "correct" what they believe to be congressional oversights by construing unambiguous statutes to the contrary of their plain meaning—apart from that rare case in which specific legislative history compels such a result—even a good faith attempt to further Congress's goals would open the way to judicial hijacking of the power to legislate.

*Consolidated Rail Corp. v. United States*, 896 F.2d 574, 579 (D.C.Cir.1990); *cf. Dow Jones & Co. v. Department of Justice*, 908 F.2d 1006, 1009 (D.C.Cir.1990) (Silberman, J.) ("It may well be true that if Congress had thought about this question, the [statute] would have been drafted more broadly.... But Congress did not, and the words simply will not stretch to cover this situation...."), *reh'g denied*, No. 89–5353 (D.C.Cir. Oct. 5, 1990).

There is nothing in the legislative history of the market exclusivity provisions to suggest the sort of "clearly expressed legislative intention to the contrary" that is normally required before a court will act to override a statute's plain meaning. *See Burlington Northern R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (quoting *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980))). Therefore, I cannot concur in the majority's decision to override the words Congress chose to express its intention in this matter—particularly based upon judicial suspicion that Congress "did not focus" on a supposed anomalous eventuality that is, at any rate, without factual support in the record.

## III.

Underlying the majority's analysis is the assumption that if one can perceive *any* ambiguity in a statute, however remote, slight or fanciful, the statute must be pushed into the second step of *Chevron* analysis, in which the court must defer to a reasonable agency interpretation. This fundamentally misconceives the point of *Chevron* analysis. *Chevron* does not suggest that courts are to search statutes, overturning linguistic rocks and brush, in the hope of discovering some arguable ambiguity, which would then justify deference

to an administrative construction. The court's responsibility under the first step of *Chevron* analysis is considerably more serious: the court is to "employ[ ] traditional tools of statutory construction" to ascertain whether "Congress had an intention on the precise question at issue." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. Minor ambiguities or occasional imprecision in language may be brooked under *Chevron*'s first step, so long as "traditional tools of statutory construction" reveal Congress' intentions. *See NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) ("On a pure question of statutory construction, our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation must be given effect...."). Advancement to *Chevron*'s second step is not appropriate merely where the court stumbles across a perceptible ambiguity; rather, given that the judiciary remains "the final authority on issues of statutory construction," *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9, abdication of that authority and deference to an administrative construction is legitimate only where the court confronts a gap in the statute that cannot be bridged by way of traditional tools of statutory construction and which can properly be characterized as an express or implied delegation of authority by Congress to an agency, *see id.* at 843–44, 104 S.Ct. at 2781–82.

In this case, the majority has alerted upon a claimed ambiguity in the statute that apparently has occurred to no other reader—not to the District Court, not to Abbott, not to the agency charged with administering the statute and not to the Government's lawyers who appeared before this court on behalf of the agency. But the majority's announcement that it can perceive an ambiguity in the statute is alone not grounds for bucking the whole business back to the agency. The real question is whether, notwithstanding some arguable imprecision in language, Congress' intentions cannot be satisfactorily discerned from the terms of the statute.

*See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). Indeed, to accept the majority's proposition that *Chevron* step-one analysis is finished as soon as a court can perceive *some* ambiguity in a statute would mean that all statutes must be analyzed under *Chevron*'s deferential second step, for clever lawyers—and clever judges—will always be capable of perceiving *some* ambiguity in any statute, no matter how clearly Congress struggles to emblazon its intentions on the face of the statute. That is clearly not what the Supreme Court intended in *Chevron* and it would hardly leave the judiciary, in any meaningful sense, as "the final authority" on issues of statutory construction. In *INS v. Cardozo–Fonseca,* 480 U.S. 421, 446–48, 107 S.Ct. 1207, 1221–22, 94 L.Ed.2d 434 (1987), Justice Stevens (who wrote the opinion for the Court in *Chevron* ) strongly indicates that the interpretation of a statutory provision remains "a pure question of statutory construction for the courts to decide" even when the provision at issue admits of some ambiguity. Thus, the second step of the *Chevron* test is applicable only when a court is unable to discern congressional intent after employing traditional tools of statutory construction.

On the facts of this case, Congress' intention in the market exclusivity provisions is absolutely clear. "Active ingredient" is an unambiguous term of art and it does not include "active moiety." The agency's suggestion to the contrary flies in the face of the clear terms of the Act. Nor is there any genuine uncertainty about Congress' intention in the statute to refer to the active ingredient of the *new drug* for which market exclusivity is sought. The majority's discovery of a purported ambiguity in the statute's use of the articles "an" and "the" is at least as strained as the agency's finding of ambiguity in the word "including." Abbott is entitled to 10 years of market exclusivity for Depakote

because neither its active ingredient, divalproex sodium, nor any ester or salt of divalproex sodium, has ever before been approved by the FDA.

Under *Chevron*, we are required to adhere to a statute's plain terms. Some courts have held that a statute's plain meaning may be ignored if there is a clear direction to the contrary in the legislative history or if strict adherence would defeat the clear purpose of Congress. However, neither possible exception applies in this case. Therefore, I would reverse the judgment of the District Court and apply the statute's plain terms in Abbott's favor.