**MYLAN PHARMACEUTICALS INC., Plaintiff,**

v.

**Jane E. HENNEY and Donna E. Shalala, Defendants,**

**Barr Laboratories, Inc., Intervenor–Defendant.**

**Pharmachemie B.V., Plaintiff,**

v.

**Jane E. Henney and Donna E. Shalala, Defendants,**

**Barr Laboratories, Inc., Intervenor–Defendant.**

**Civil Action Nos. 99–cv–862(RMU), 99–cv–801 (RMU).**

United States District Court, District of Columbia.

March 31, 2000.

James Harold Wallace, Jr., Wiley, Rein & Fielding, Washington, DC, for Mylan Pharmaceuticals, Inc.

Mark E. Nagle, Wilma Antoinette Lewis, Meredith Manning, U.S. Attorney's Office, Washington, DC, for Jane E. Henney, Donna E. Shalala.

Michael K. Atkinson, Charles Bennett Klein, Winston & Strawn, Washington, DC, for Barr Laboratories, Inc.

Geoffrey M. Levitt, James N. Czaban, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, for Pharmachemie B.V.

## MEMORANDUM OPINION

URBINA, District Judge.

ORDERING CONSOLIDATION OF CASES; DENYING MYLAN'S AND PHARMACHEMIE'S MOTIONS FOR INJUNCTIVE RELIEF; DENYING MYLAN'S AND PHARMACHEMIE'S MOTIONS TO INTERVENE; REMANDING TO FDA FOR PERMISSIBLE INTERPRETATION OF 21 U.S.C. § 355(j)(5)(B)(iv) AND REGULATION 314.94(a)(12)(viii)

## I. INTRODUCTION

Pharmachemie, B.V. ("Pharmachemie") and Mylan Pharmaceuticals, Inc. ("Mylan"), generic manufacturers of the drug tamoxifen (together, the "Parties"), bring separate actions against Defendant Jane E. Henney, M.D., in her official capacity as Commissioner of the United States Food and Drug Administration, and against Defendant Donna E. Shalala, in her official capacity as Secretary of the United States Department of Health and Human Services (collectively referred to as the "FDA"). The Parties, whose tamoxifen drugs are used in the treatment of breast cancer, bring their actions under the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. (Mylan's Compl. at 2; Pharmachemie's Compl. ("Pharm.'s Compl.") ¶ 9.) Barr Laboratories ("Barr") is a manufacturer of the generic drug tamoxifen, currently exclusively licensed by the owner of the patent to market the drug. (Pharm.Mot. for Prelim.Inj., Ex. 4.)

Mylan and Pharmachemie both assert that the FDA acted arbitrarily and capriciously in rendering by letter dated March 2, 1999 (the "March Letter"), its decision to grant Barr's request that the FDA stay approval of any version of the drug tamoxifen other than Barr's version. (Mylan's Compl. at 2; Pharm.'s Compl. ¶ 5.) The effect of the March Letter is that neither Mylan nor Pharmachemie has the opportunity to market their generic version of tamoxifen until the patent for tamoxifen expires on August 20, 2002. In essence, both maintain that the March Letter violates the FDCA and runs contrary to the agency's own regulations. *See id.*

Before reaching the merits of the underlying dispute, the court makes the following preliminary determinations, which will assist in the efficacious management and just resolution of this case. First, the court orders the cases, *Mylan v. Henney et al.* and *Pharmachemie v. Henney et al.* consolidated for the reasons discussed *infra* at II.C. Second, the court denies both parties' outstanding motions to intervene for the reasons articulated *infra* at III.C. Before elaborating on the reasons for these preliminary determinations, the court turns to consider the statutory and regulatory framework that gives rise to the parties' common claims in this now consolidated action.

## II. BACKGROUND

### A. The Hatch–Waxman Amendments

#### I. NDA, ANDA and Expedited Generic Approvals

An understanding of the statutory and regulatory framework applicable to the marketing of generic drugs is critical to assessing the merits of the parties' claims.

Generic drugs are versions of brand-name prescription drugs that typically contain the same active ingredients as the brand-name original. *See United States v. Generix Drug Corp.*, 460 U.S. 453, 455, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1980); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1062 (D.C.Cir.1998). Ordinarily, an applicant seeking to market a new brand-name drug ("a pioneer maker") must prepare a rigorous New Drug Application ("NDA") for FDA approval, which includes data showing the new drug's safety and effectiveness. Before 1984, a company that wished to make a generic version of an FDA-approved brand-name drug ("a generic maker") had to file another NDA. Preparation of the second NDA was as time-consuming and costly as the original, because the application had to include new studies showing the drug's safety and effectiveness. *See Mova*, 140 F.3d at 1063.

In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, also known as the Hatch–Waxman Amendments ("Hatch–Waxman"), which simplified the procedure for obtaining approval of generic drugs. *See* Pub.L. No. 98–417, 98 Stat. 1585 (1984). Under Hatch–Waxman, the pioneer maker is still required to file an NDA, complete with safety and effectiveness data. Subsequent applicants who wished to manufacture generic versions of the original drug, however, were only required to file an *Abbreviated New Drug Application* ("ANDA"). The ANDA is allowed to rely on the FDA's previous determination that the drug is safe and effective. *See* 21 U.S.C. § 355(a); *Mead Johnson Pharmaceutical Group v. Bowen*, 838 F.2d 1332, 1333 (D.C.Cir.1988). As a result of the ANDA innovation under Hatch–Waxman, generic makers can obtain expedited approval to market generic versions of drugs that have undergone the rigors of "pioneer" approval under the NDA process.

Moreover, generic makers are permitted to manufacture and use drugs protected by a patent(s) if the otherwise infringing activity is related to the development and submission of an ANDA. *See* 35 U.S.C. § 271(e)(1). Finally, Hatch–Waxman establishes an ANDA certification process, whereby generic makers can obtain expedited approval for their ANDAs before expiration of the pioneer maker's patent. *See* 21 U.S.C. § 355(j)(5)(B).

## III. ANDA Certification and Expedited Approval

Hatch–Waxman potentially enables generic makers who adhere to certain requirements to obtain expedited ANDA approval as follows. First, a generic maker seeking approval of its ANDA must demonstrate that (1) the generic version of the drug is "bio-equivalent" to the pioneer NDA version and (2) the generic maker is able to manufacture the drug to required specifications. *See* 21 U.S.C. § 355(j)(2)(A)(iv). Second, and of moment to this controversy, the ANDA must include a "certification, that for each of the patents applicable to the pioneer drug, the proposed generic drug would not infringe the patent because (I) the patent information has not been filed; (II) the patent has expired; (III) the patent will expire on a stated date; or (IV) the patent is invalid or will not be infringed by the manufacture, use or sale of the drug for which the abbreviated application applicant seeks approval." *See* 21 U.S.C. § 355(j)(2)(A)(vii); *Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1202 (D.C.Cir.1998). The court will refer to the above-referenced certification clauses as Paragraphs I, II, III and IV, respectively.

### (i) Paragraph IV and Expedited Approval

Submission of an ANDA for a patented drug is an infringing act if the generic maker intends to market its generic version before expiration of the original maker's patent. (*See* Pharm.Mot for Prelim.Inj., Ex 4, *Guidance for Industry, 180–Day Generic Drug Exclusivity* ("Guidance"), at 2.) For example, a generic maker seeking certification of his ANDA under Paragraph III must wait for the pioneer maker's patent to expire and, consequent-

ly, will not infringe the patent. But a generic maker seeking certification of his ANDA under Paragraph IV, on the grounds that the pioneer maker's patent is invalid, triggers a multi-tiered process that potentially enables him to obtain approval of his ANDA and market his generic drug before the pioneer maker's patent expires.

### (ii) Paragraph IV and Infringement Actions

The FDA can approve a generic maker's Paragraph IV-certified ANDA immediately, unless the pioneer maker brings an action for patent infringement against the ANDA applicant within 45 days of the date the pioneer maker receives notice of the Paragraph IV certification. *See* 21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(f)(2).[1] If a patent action is brought within 45 days, however, the ANDA will not be approved until at least 30 months from the date the affected parties, i.e., pioneer makers, receive notice.[2] Thus, the potential exists for costly patent litigation against the generic maker that files a Paragraph IV-certified ANDA.

### (iii) The Exclusivity Incentive

As an incentive to the first generic maker to expose himself to the risk of costly patent litigation, the Hatch–Waxman regime provides that the first to file a Paragraph IV certified ANDA ("the first filer") is eligible for a 180–day period of marketing protection, commonly known as the 180–day exclusivity period ("the Exclusivity Incentive"). *See* 21 U.S.C. § 355(j)(5)(B)(iv), as amended by Public Law No. 105–115, 111 Stat. 2296 (1997); *Mova v. Shalala,* 140 F.3d 1060, 1064 (D.C.Cir.1998) ("*Mova* 1998"). By its terms, the Exclusivity Incentive affords the first filer protection from competition from subsequent generic makers for 180 days beginning from the earlier of a com-

mercial marketing or court decision. In explaining what is intended a court decision, the Exclusivity Incentive makes explicit reference to "clause (iii)" of the statute. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

### B. Factual Background

The facts material to disposition of this consolidated action date back to August, 1985, when a pioneer maker secured the original patent for brand-name tamoxifen, which is a drug used in the treatment of breast cancer. On August 20, 1985, Imperial Chemicals Industries, PLC ("Imperial") obtained U.S.Patent 4,536,516, covering tamoxifen. Imperial's subsidiary, Zeneca Inc. ("Zeneca") is the sole producer of tamoxifen under Imperial's patent. In December, 1985, Barr Laboratories, a generic maker of tamoxifen, submitted an ANDA requesting FDA approval to market its own generic version of tamoxifen. (Mylan's Compl. at 7; Pharm.'s Compl. ¶ 38.)

In September, 1987, Barr amended its ANDA to include a Paragraph IV certification and to challenge the validity of Imperial's tamoxifen patent. *See id.* After amending its ANDA, Barr sent Imperial notice that it contended Imperial's patent was invalid. The FDA gave effect to Barr's amended paragraph IV certification. (Mylan's Compl. at 7; Pharm.'s Compl. ¶ 40.) In other words, Barr became potentially eligible for the Exclusivity Incentive. *Id.*

After receiving notice of the challenge, Imperial sued Barr for patent infringement in the United States District Court for the Southern District of New York ("Southern District"). (Mylan's Mem. in Supp. of Mot. for Summ.J. at 6; Pharm.'s Mem. in Supp. of Mot. for Summ.J. at 13.)

---

**1.** The generic maker who applies for an ANDA ("ANDA applicant") and includes a Paragraph IV certification must give notice of filing to the patent owner and the NDA holder for the listed drug. *See* 21 U.S.C. § 355(j)(2)(B). Such notice must include a detailed statement of the factual and legal basis for the ANDA applicant's opinion that

the patent is not valid or will not be infringed. *See* 21 U.S.C. § 355(j)(2)(B).

**2.** The 30–month period applies unless a final decision is reached earlier in the patent case or the patent court orders a longer or shorter period for effective approval. *See* 21 U.S.C. § 355(j)(5)(B)(iii)(I).

On July 21, 1992, the Southern District held that Imperial's tamoxifen patent was invalid because Imperial deliberately, knowingly and fraudulently withheld material information from the Patent and Trademark Office. *See Imperial Chem. Ind., PLC v. Barr Lab., Inc.*, 795 F.Supp. 619, 629 (S.D.N.Y.1992) ("the Southern District decision").

Imperial filed a notice of appeal with the United States Court of Appeals for the Federal Circuit, but before any substantive review by the Federal Circuit, Imperial settled the case with Barr ("the Settlement"). (*See* Pharm.'s Compl. ¶ 44.) The Settlement was expressly conditioned on Barr's agreement to abandon its challenge to the validity of Imperial's patent. Barr would abandon its challenge by amending its Paragraph IV certified ANDA back to a Paragraph III certified ANDA ("the Amendment Back"). Pursuant to the Settlement and as a result of the Amendment Back, Barr's ANDA was no longer eligible for approval until after August 20, 2002, the date that Imperial's tamoxifen patent was scheduled to expire. (*See* Pharm.'s Compl. ¶ 45.) In exchange, Imperial paid Barr $21 million and granted Barr a license to market tamoxifen. (Mylan's Compl. at 8; Pharm.'s Compl. ¶ 44.)

After settling the case but during the pendency of the appeal before the Federal Circuit, Imperial and Barr jointly moved to (1) vacate the July 21, 1992 judgment of the Southern District and (2) remand the case with instructions to dismiss without prejudice pursuant to Federal Rule of Civil Procedure 41(a). *See Imperial Chemical Industries, PLC v. Heumann Pharma GmbH & Co. et al.*, 991 F.2d 811, 811 (Fed.Cir.1993) (unpublished disposition). The Federal Circuit issued a short order that granted the parties' request, finding that the "parties to the district court proceeding have entered into a settlement agreement resolving the entire dispute." *Id.*

During the appeal to the Federal Circuit, a nonparty "Generic Drug Manufacturer" sought to argue by *amicus* brief that the Federal Circuit should not vacate the Southern District's decision. *Id.* The Federal Circuit, however, denied the generic nonparty's belated request, reasoning that the issue would "interfere with the parties' settlement of a dispute." *Id.* In 1993, the Federal Circuit granted the parties' joint request to vacate the Southern District's decision and remanded the matter to the Southern District with instructions to dismiss.

Within a year of the Federal Circuit's vacatur of the Southern District's decision, in August 1994, Pharmachemie submitted a Paragraph III ANDA for its generic version of tamoxifen. In January 1996, Mylan submitted a Paragraph IV ANDA for its generic version of tamoxifen. (Mylan's Compl. at 9.) In February, 1996, Pharmachemie amended its ANDA to include a Paragraph IV certification. (Pharm.'s Compl. ¶ 48.)

After Mylan submitted its paragraph IV ANDA in January 1996, Zeneca sued Mylan for infringement. Because Zeneca brought a patent infringement action against Mylan within 45 days, the 30 month statutory stay of approval was triggered against Mylan and scheduled to expire on July 10, 1998. (Mylan's Compl. at 10.) After Pharmachemie amended its ANDA to reflect a Paragraph IV ANDA, Zeneca sued Pharmachemie for patent infringement within 45 days. The 30–month statutory stay was triggered and scheduled to expire in August, 1998.[3]

But in June, 1998, approximately one month before Mylan's and two months before Pharmachemie's 30 month statutory stays were to expire, Barr filed a Petition for Stay with the FDA ("Petition"). The Petition asked the FDA to continue to credit Barr with the Exclusivity Incentive to the exclusion of all other generic mak-

---

**3.** The FDA tentatively approved Pharmachemie's ANDA for its generic version of tamoxi-

fen on April 3, 1997. (Pharm.'s Compl. ¶ 52.)

ers of tamoxifen. (Pharm.Mot. for Prelim.Inj., Ex. 8.) Specifically, Barr's Petition asked the FDA not to approve any ANDA for a generic version of tamoxifen until 180 days after: (1) Barr's first commercial marketing of generic tamoxifen under its ANDA; or (2) the date of a final decision of a court holding the tamoxifen patent to be invalid or not infringed. *Id.* at 11. Barr's Petition came in the midst of the FDA's determination, in light of adverse court decisions, to overhaul its interpretation and application of the Exclusivity Incentive under 21 U.S.C. § 355(j)(5)(B)(iv).

Recent court decisions challenging the agency's interpretation of requirements found in the FDA's regulations, specifically at 21 C.F.R. § 314.107(c)(1), prompted the FDA to issue a "formal" position in the form of a "Guidance For Industry." (*See* Pharm.Mot. for Prelim.Inj., Ex. 4, Guidance); *see also Inwood Laboratories, Inc. v. Young,* 723 F.Supp. 1523 (D.D.C.), *vacated as moot,* 43 F.3d 712 (D.C.Cir.1989); *Mova Pharmaceutical Corp. v. Shalala,* 955 F.Supp. 128 (D.D.C.1997) (*"Mova 1997"*) (FDA enjoined from enforcing successful defense requirement in C.F.R. 314.107(c)(1)); *Granutec, Inc. v. Shalala,* 139 F.3d 889, 1998 WL 153410, *3 (4th Cir.1998) (unpublished disposition) ("The language of the statute may be complex, and even cumbersome, but it is plain and unambiguous. It does not include a 'successful defense' requirement, and indeed it does not even require the institution of patent litigation.") The Guidance outlined the FDA's interim strategy for interpreting Section 355(j)(5)(B)(iv), pending final promulgation of new regulations.

In announcing the FDA's interim strategy pending overhaul, the Guidance states: " [T]he Agency intends to undertake a

rulemaking to issue new regulations to fully implement the 180–day generic exclusivity provisions in light of recent court decisions." (*See* Pharm.Mot. for Prelim.Inj., Ex. 4, Guidance.) The guidance also states:

> FDA intends to formally remove the 'successful defense' provisions from § 314.107(c)(1), but that process is not complete. Following withdrawal of the regulatory provision, FDA expects to begin rulemaking to issue new regulations under section [355](j)(5)(B)(iv) [4]. In the meantime, the Agency must make exclusivity decisions for ANDAs that are nearing approval. Until such time as the rulemaking process is complete, FDA will regulate directly from the statute, and will make decisions on 180–day generic drug exclusivity on a case-by-case basis.

(*See* Id.) Thus, FDA announced that it would regulate directly from the statute. Moreover, the Guidance promised to "remain in effect until superceded [sic] by new regulations or new guidance." (Id.)

Barr's Petition came in the midst of the FDA's determination that it would seek to regulate from the statute. In response to the Petition, Janet Woodcock, M.D., Director of the FDA's Center for Drug Evaluation and Research, announced to Barr by letter dated March 2, 1999 ("the March Letter"): "[a]fter careful review of your petition and supplement, as well as comments to the petition received by FDA, the Agency grants the petition for the following reasons . . . ." Thus, the FDA granted Barr's Petition to preserve its Exclusivity Incentive and to exclude all other generic makers of tamoxifen. (Pharm.'s Mot. for Prelim.Inj., Ex. 1, March Letter.) [5]

---

**4.** The Guidance references "section 505(j)(5)(B)(iv)" in the exerted paragraph. In the interest of consistency, however, the court substitutes section 355(j)(5)(B)(iv). The Hatch Waxman Amendments created section 505(j) of the Act (21 U.S.C. § 355(j)). (*See* Pharm. Motion for Prelim.Inj., Ex. 4, Guidance at unnumbered p. 1.)

**5.** The FDA March Letter announced that it was granting Barr's request that the Agency

stay the effective date of approval of any ANDA for tamoxifen other than one submitted by Barr, until 180 days after the date of the first commercial marketing of the drug under BARR's, or the date of a final decision of a court holding the tamoxifen patent to be invalid or not infringed. (*See* Pharm.Mot. for Prelim.Inj., Ex. 1.)

The March Letter explained, over the course of four pages, its reasons for granting Barr's Petition. It is the March letter that forms the basis for both parties' common claim that the FDA violated the FDCA and its own internal regulations. (Mylan's Compl. at 2; Pharm.'s Compl. ¶¶ 59 – 62.)

## C. Consolidation of Cases With Common Questions

■ In view of the legal framework and factual background that gives rise to the parties' common claims, the court orders the cases consolidated for the reasons that follow. Rule 42(a) of the Federal Rules of Civil Procedure provides that a court may order a joint hearing or trial of any or all matters in issue before the court that involve a common question of law or fact. See FED.R.CIV.P. 42(a). A court may join related proceedings to "avoid unnecessary costs or delay." Id. Consolidation of cases is "permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." See Johnson v. Manhattan R Co., 289 U.S. 479, 496–97, 53 S.Ct. 721, 77 L.Ed. 1331 (1933). A court has discretion to consolidate cases under Rule 42(a) if such consolidation will help it manage its caseload with "economy of time and effort for itself, for counsel, and for litigants." See Landis v. American Water Works & Electric Co., 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936).

By its plain language, Rule 42(a) permits sua sponte consolidation: "[w]hen actions involving a common question of law or fact are pending before this court … it may order all the actions consolidated." FED. R.CIV.P. 42(a) (emphasis added). The United States Court of Appeals for the District of Columbia Circuit has, by its own motion, ordered the consolidation of a number of related cases. See, e.g., United States v. Pless, 1998 WL 315516 (D.C.Cir. 1998); Mankato Citizens Telephone Co. v. FCC, 1996 WL 393512 (D.C.Cir.1996); American Forest and Paper Association v. EPA, 1995 WL 311743 (D.C.Cir.1995); Resolution Trust Corp. v. Cohen, 1994 WL 191734 (D.C.Cir.1994); see also In re Pepco Employment Litigation, 1990 WL 236073, *1 (D.D.C.1990); Pettersen v. United States, 1987 WL 13351 (D.D.C. 1987). Although a decision to consolidate is appealable after final judgment, it is not disturbed except when the district court has abused its discretion. See NAACP v. Michot, 480 F.2d 547, 548 (5th Cir.1973); Davis v. Yellow Cab Co., 220 F.2d 790, 791 (5th Cir.1955) ("the trial court had a large discretion in the matter which will not be interfered with except in a clear case of abuse").[6]

■ Mylan v. Henney and Pharmachemie v. Henney are related cases before this court. In each case, the allegations in the complaints, the named defendants and the grounds for relief are similar. In essence, both plaintiffs challenge the March Letter granting Barr's Petition and contend that FDA's determinations expressed therein violate the FDCA and its own regulations. (Pharm.'s Mem. in Supp. of Mot. for Prelim.Inj. at 2; Mylan's Mem. in Supp. of Mot. for Prelim.Inj. at 2.) Specifically, Pharmachemie challenges the FDA's delay of the effective approval date of its tentatively approved ANDA, while Mylan

---

**6.** Courts in most federal jurisdictions interpret Rule 42(a) to permit court-asserted motions for consolidation. See Frazier v. Garrison I.S.D., 980 F.2d 1514, 1531 (5th Cir.1993) ("[A] trial court may consolidate multiple actions if the actions involve common questions of law or fact."); Yousefi v. Lockheed Martin, 70 F.Supp.2d 1061, 1065 (C.D.Cal.1999) ("a district court presiding over the matters may order consolidation sua sponte"); Midwest Community Council, Inc. v. Chicago Park Dist., 98 F.R.D. 491, 499–500 (C.D.Ill.1983) ("If two cases appear to be of like nature and relative to the same question, if joint trial would avoid unnecessary costs and delay, and it is reasonable to try them together, it is within the district court's discretionary power to order consolidation and the fact that consolidation issue is raised by the court sua sponte is not dispositive") (citing Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 292, 12 S.Ct. 909, 36 L.Ed. 706 (1892))

challenges FDA's determination that Barr, rather than Mylan, is entitled to the Exclusivity Incentive for marketing generic tamoxifen. (Pharm.'s Mem. in Supp. of Mot. for Prelim.Inj. at 1–2; Mylan's Mem. in Supp. of Mot. for Prelim.Inj. at 2.)

While both parties seek to set aside the March Letter, each plaintiff demands different forms of relief. Pharmachemie, for example, seeks to enjoin the FDA from imposing an "indefinite delay" on the effective date of its tamoxifen ANDA. (Pharm.'s Mot. for Prelim.Inj. at 1.) Mylan seeks to enjoin the FDA, but also seeks entitlement to the 180–day Exclusivity Incentive for marketing its generic tamoxifen. (Mylan's Mot. for Prelim.Inj. at 1.) The plaintiffs' requests for different forms of relief do not vitiate the propriety of consolidation, but rather, consolidation is proper to *any or all* matters in issue which are common. *See Cass v. Sonnenblick–Goldman Corp.,* 287 F.Supp. 815 (E.D.Pa.1968) (court ordered consolidation despite objections); *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 293, 12 S.Ct. 909, 36 L.Ed. 706 (1892) (holding that a court may order consolidation of cases despite opposition by parties when such consolidation is reasonable and avoids unnecessary costs or delays).

Informed by Rule 42(a) and prevailing case law, the court concludes that Mylan and Pharmachemie raise common issues of law and fact. Both allege that the FDA's decision embodied in its March Letter violates 21 U.S.C. § 355(j)(5)(B)(iv). (Mylan's Compl. at 2; Pharm.'s Compl. ¶ 65.) Both seek an order from the court to set aside the March Letter and a declaration that FDA's determination was arbitrary, capricious and without statutory authority. (Mylan's Compl. at 2; Pharm.'s Compl. ¶¶ 71, 79.) The court concludes that consolidation to resolve common questions raised by these cases is appropriate. The cases are hereby consolidated in the interest of just, speedy and efficient determination of the actions.

## III. DISCUSSION

### A. Legal Standard for Summary Judgment

Summary judgment may be granted when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). A genuine issue is one that could change the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

All evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment must be granted if the movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the ultimate burden of proof at trial." *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. By pointing out the absence of evidence to support the nonmoving party's case, the movant can demonstrate that there is no genuine issue as to any material fact, therefore entitling it to summary judgment. *Id.* at 325, 106 S.Ct. 2548.

### B. Preliminary Injunction
#### 1. Standard for Injunction

■ Mylan and Pharmachemie ask this court to enjoin the FDA from enforcing its March Letter, which stays approval of their tentative ANDAs. Courts considering a request for preliminary or permanent injunction must examine the following factors: (1) whether there is a substantial likelihood that the plaintiff will succeed on the merits; (2) whether the plaintiff will be irreparably injured if an injunction is not

granted; (3) whether an injunction will substantially injure the non-moving party; and (4) whether the public interest will be furthered by the injunction. *See* FED. R.CIV.P. 65; *Serono Laboratories, Inc. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir. 1998); *Washington Metro. v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir. 1977); *Mylan Pharmaceuticals v. Shalala,* 81 F.Supp.2d 30, 36 (D.D.C.2000) (*"Mylan 2000"*).

## 2. Injunction, Exhaustion and Likelihood of Success

■ Movants requesting preliminary injunction of agency action face an additional hurdle in establishing the requisite likelihood of success. To obtain judicial relief on an administrative claim, a plaintiff must first exhaust his or her administrative remedies mandated by statute. The "long settled rule of judicial administration [is] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *F.C.C. v. Schreiber,* 381 U.S. 279, 296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965) (quoting *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938)). The District of Columbia Court of Appeals held:

It is a well-established doctrine that where a statute provides an administrative forum to resolve disputes, no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.

*See District of Columbia v. Group Insurance,* 633 A.2d 2, 20 (D.C.1993) (quoting *Dano Resource Recovery, Inc. v. District of Columbia,* 566 A.2d 483, 485 (D.C. 1989)).

The FDA defines "administrative exhaustion" for purposes of invoking judicial relief as follows. Under 21 C.F.R. § 10.45, the Commissioner's final decision constitutes final agency action subject to judicial review "on a petition for stay of action" submitted under 21 C.F.R. § 10.35. Thus, the FDA's March Letter constitutes final agency action.

## 3. Mylan's Claims of Entitlement to Exclusivity are Not the Proper Subject of Review Because Mylan Has Failed to Exhaust its Administrative Remedies

■ The administrative record in this case includes Barr's Petition, Mylan's and Pharmachemie's oppositions to Barr's Petition, and the FDA's March Letter. (*See* Mylan's Mot. for Summ.J., Exs. G, H, I.) Because Mylan and Pharmachemie filed oppositions to Barr's Petition before the FDA made its final determination, the parties have exhausted administrative remedies as to their claims for declaratory relief and prohibitive injunction. Thus, Pharmachemie's and Mylan's claims seeking to enjoin the FDA's enforcement of its March Letter granting Barr' Petition are properly before this court. Mylan's submission, however, also asserts that Mylan is entitled to the 180–day Exclusivity Incentive. (*See* Mylan's Mot. for Prelim.Inj. at 1.) This issue was never raised in Mylan's opposition to Barr's Petition at the agency level and, therefore, is not the proper subject of judicial review at this time. Mylan has failed to exhaust its administrative remedies with respect to its claim of entitlement to exclusivity.

Having failed to exhaust its administrative remedies regarding claims of entitlement to exclusivity, Mylan can not demonstrate the requisite likelihood of success on the merits for an injunction.[7] As the D.C. Circuit held in *Wallace v. Lynn,* "[w]here a failure to exhaust administrative remedies would likely preclude an award of relief at the end of litigation, the party seeking relief has not made a sufficient showing of probability of ultimate success to obtain a preliminary injunction." *Wallace v. Lynn,* 507 F.2d 1186, 1189 (D.C.Cir.1974). In

7. Moreover, in the course of reviewing legal authorities, this court found that a company called Novopharm may have filed a Para-graph IV ANDA for tamoxifen before Mylan. *See Zeneca, Ltd. v. Novopharm,* 111 F.3d 144 (Fed.Cir.1997).

*Randolph–Sheppard Vendors of America v. Weinberger,* this Circuit added:

> The standard for determining whether to grant a preliminary injunction ... specifically requires a court to consider not only the harm threatened ... but the likelihood of plaintiffs' success on the merits, and the relative harms to the parties and the public interest from granting or denying the motion. These additional facets of the preliminary injunction inquiry ensure that its purpose is fulfilled, [the purpose being to] safeguard ... appellants' rights with the least possible intrusion on the administrative process.

*Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 110 (D.C.Cir. 1986). The court, accordingly, denies Mylan's motion for a preliminary injunction insofar as Mylan asserts any premature claims of entitlement to exclusivity.

This determination, further, is the basis for the court's decision to deny the parties leave to intervene. The court, accordingly, turns from its discussion of this injunction to set forth its reasons for denying the parties' outstanding motions to intervene.

### C. Motions to Intervene Are Denied

■ Mylan and Pharmachemie request the right to intervene as third-party defendants in each others' now-consolidated matters. A motion to intervene as of right turns on the movant's ability to demonstrate: (1) timeliness of the motion, (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action, (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest and (4) whether the applicant's interest is adequately represented by existing parties. *See* FED.R.CIV.P. 24(a); *Mova 1998,* 140 F.3d at 1074. A party seeking to intervene of right must also "demonstrate that it has standing to participate in the action." *See Mova 1998,* 140 F.3d at 1074 (citing *Southern Christian Leadership Conference v. Kelley,* 747 F.2d 777, 779 (D.C.Cir.1984)).

■ Mylan lacks standing to assert its claim for exclusivity because it has failed to exhaust its administrative remedies as to that claim. "Intervenors may only argue issues that have been raised by the principle parties; they simply lack standing to expand the scope of the case to matters not addressed by the petitioners in their request for review." *National Association of Regulatory Utility Commissioners v. Interstate Commerce Commission,* 41 F.3d 721, 729 (D.C.Cir.1994). In addition, Pharmachemie's claims that the FDA will not adequately represent its interest in preventing Mylan from obtaining exclusivity are mooted by the summary dismissal of Mylan's claims for exclusivity on the grounds of no standing. As to Mylan and Pharmachemie's interest in intervention for the purpose of setting aside the March Letter granting Barr's Petition, Pharmachemie states, and the court agrees, that this interest is adequately represented by Pharmachemie's appearance as a plaintiff in its own lawsuit, now consolidated and before this court. (*See* Pharm.'s Mot. for Leave to Intervene at 5.) Mylan's interest is equally protected by the same logic and analysis that applies to Pharmachemie. For all these reasons the court denies the parties' motions for intervention of right.

As to Mylan and Pharmachemie's requests that this court *permit* their intervention, the court concludes that it is contrary to the interest in efficient and timely resolution of this complex matter to grant the motions for permissive intervention. *See State of Illinois v. Bristol–Myers Co.,* 470 F.2d 1276, 1279 (D.C.Cir.1972) (upholding a decision to deny leave to intervene after considering the potential delay facing the court in the complex litigation); *see also Nuesse v. Camp,* 385 F.2d 694, 704 (D.C.Cir.1967) (permissive intervention may be denied in order to avoid the likelihood of delay). The court, accordingly,

denies Mylan's and Pharmachemie's requests for permissive intervention.

Having made preliminary determinations consolidating these matters and denying the parties' motions to intervene, and having discussed the legal and factual underpinnings of this controversy, the court is poised to determine whether the parties have demonstrated the requisite likelihood of success on the merits that might warrant injunctive relief. In so doing, the court considers the arguments raised in the parties' respective cross-motions for summary judgment, dismissal and preliminary injunction, now a part of the record in this consolidated action. In order to assess the likelihood of success as to the remaining claims, the court outlines the legal standards governing judicial review of agency action.

## D. Judicial Review of Agency Action
### 1. Standards Governing FDA's Interpretation of the FDCA

■ Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), courts employ a two-step test in determining whether an agency proffers a permissible interpretation of a statute it administers. *See id.* at 842–43, 104 S.Ct. 2778. First, courts consider the plain meaning of the statute. The plain meaning of a statute is derived from both the statutory language itself, "as well as the language and design of the statute as a whole." *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); *Bethesda Hospital Ass'n v. Bowen*, 485 U.S. 399, 403–405, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988); *Mylan 2000*, 81 F.Supp.2d at 37. If the court determines that Congress has spoken to the precise question presented by the parties, the court must give effect to the unambiguously expressed intent of Congress. *See Chevron*, 467 U.S. at 842, 104

S.Ct. 2778. Thus, when a statute is clear and unambiguous, "consideration of administrative interpretation contrary to such language is inappropriate; the agency cannot by its interpretation, override the congressional will as memorialized in the statutory language." *See Inwood Laboratories, Inc. v. Young*, 723 F.Supp. 1523, 1526 (D.D.C.1989). An agency may not substitute its own policy for that of the legislature. *See* Sutherland Stat. Const. § 65.1 (5th ed.1992).

On the other hand, if the court determines that Congress has not spoken to the precise issue because "the statute is silent or ambiguous with respect to the specific issue," the court advances to the second step of *Chevron*. *See Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Under *Chevron* step two, the court determines whether the agency's answer is based on a permissible construction of the statute. *Id. Chevron* step two is not invoked when the court merely stumbles upon a potential ambiguity:

> [G]iven that the judiciary remains the 'final authority on issues of statutory construction,' abdication of that authority and deference to an administrative construction is legitimate only where the court confronts a gap in the statute that cannot be bridged by traditional tools of statutory construction and which can properly be characterized as an express or implied delegation of authority by Congress to an agency.

*See Abbott Laboratories v. Young*, 920 F.2d 984, 995 (D.C.Cir.1990) (Edwards, C.J., dissenting o.g.) (citing *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778). Rather, deference is appropriate where the court confronts a gap that cannot be bridged by traditional tools of statutory construction, and it is evident that Congress intended for the agency to "annotate its words." *See Buongiorno v. Sullivan*, 912 F.2d 504, 509 (D.C.Cir.1990).[8] In the absence of such express or implied delegation of gap-

---

**8.** Title 21 U.S.C. § 355(j)(5)(B) does not include an explicit grant of rulemaking authority. *Cf.* 42 U.S.C. § 254*o*(d)(2), which does not apply in this case: "The Secretary *shall*

*by regulation provide* for the partial or total waiver or suspension of any obligation of service or payment by an individual under the Scholarship Program ..." (Emphasis added).

filling authority, the court presumes that the "legislature says in a statute what it means and means in a statute what it says...." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *see also Stewart v. National Shopmen Pension Fund*, 730 F.2d 1552, 1561 (D.C.Cir.1984) ("the best guide to what a statute means is what it says;" had Congress intended plaintiffs' construction of the statute, "it could easily have said so").

If, however, the court advances to *Chevron* step two, the court must defer to the agency's reasonable interpretation so long as it does not conflict with the statute's plain meaning. *See K Mart*, 486 U.S. at 281, 108 S.Ct. 1811. Indeed, where an agency's interpretation involves issues of considerable public controversy, and Congress has not acted to correct any misperception of its statutory objectives, the agency's interpretation is entitled to substantial deference. *See United States v. Rutherford*, 442 U.S. 544, 545, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).

## 2. Standards Governing FDA's Interpretation of its Regulations

■■■■ Similarly, well-known principles govern the court's review of an agency's interpretation of its own regulations. The standard is one of "substantial deference" to the agency's interpretation, which has "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *See S.G. Loewendick & Sons v. Reich*, 70 F.3d 1291, 1294 (D.C.Cir.1995) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citations omitted)). Moreover, an agency's failure to follow its own regulation is fatal to the deviant action. *See IMS, P.C. v. Alvarez*, 129 F.3d 618, 621 (D.C.Cir.1997) (citations omitted). Internally inconsistent reasoning by a government agency is not entitled to any deference by the courts, and is inherently arbitrary and capricious. *See Chevron*, 467 U.S. at 837, 104 S.Ct. 2778 (1984); *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381. Even if an agency pur-

ports to "fill the gap in addressing the statute's ambiguity", the result reached by the agency is still impermissible under *Chevron* if it is "inconsistent with its prior analysis in similar situations without any acknowledgment of the fact, or cogent explanation as to why." *King Broadcasting Co. v. FCC*, 860 F.2d 465, 470 (D.C.Cir. 1988); *see also General Motors Corp. v. NHTSA*, 898 F.2d 165, 174 (D.C.Cir.1990).

It is also true that agency action must reflect clear, rational decision-making that gives regulated members of the public adequate notice of their obligations. *See S.G. Loewendick & Sons*, 70 F.3d at 1297. Although the Secretary certainly has the authority to offer definitive interpretations of its regulations in the context of litigation, the "decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties ... and on other factors relevant to the reasonableness of the Secretary's exercise of delegated lawmaking powers." *S.G. Loewendick & Sons*, 70 F.3d at 1297–98 (citing *Martin v. OSHA Review Comm'n*, 499 U.S. 144, 158, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)).

## E. The FDA Fails to Demonstrate a Likelihood of Success on the Merits Because the March Letter is an Impermissible Interpretation of 21 U.S.C § 355(j)(5)(B) and 21 C.F.R. § 314.94(a)(12)(viii)

In applying *Chevron* step one to FDA's March Letter, the court must ascertain whether 21 U.S.C § 355(j)(5)(B) addresses the precise issues now before the court. The FDA made two determinations in its March Letter that are now being challenged as impermissible constructions of Section 355(j)(5)(B). First, the FDA gave no effect to the Southern District decision that determined that Barr had not infringed Imperial's patent and that Barr was entitled to 180 days of marketing exclusivity. Second, the FDA determined that Barr was the first Paragraph IV ANDA applicant and thus, was entitled to exclusivity, despite the fact that first-filer

Barr's application had not contained a Paragraph IV certification since 1993. In sum, the FDA, by its March Letter, determined that Barr was the first Paragraph IV ANDA applicant, and that neither the court-trigger nor the market-trigger applied.

### (1) Southern District Decision Given No Effect by the FDA

According to Mylan and Pharmachemie, the FDA's March Letter is inconsistent with the plain language of 21 U.S.C. § 355(j)(5)(B)(iv), with Congress' clear intent and with sound public policy. (Mylan's Compl. at 2; Pharm.'s Compl. ¶ 5.) The court evaluates this challenge to the agency's statutory interpretation according to the familiar principles announced in *Chevron.* When a statute is clear and unambiguous, the administrative agency may not override the clear intent of congress with its own contrary interpretation. *See Inwood Laboratories,* 723 F.Supp. at 1526. Such is the precise case before this court.

In its March Letter, the FDA gives no effect to the Southern District's decision, rendered in Barr's favor, which held that Imperial's patent for tamoxifen was invalid. (*See* Pharm.'s Mot. for Prelim.Inj., Ex. 1 at 4.) Although the district court's decision was vacated during the pendency of appeal and pursuant to a settlement agreement, the FDA, without explanation, sweepingly ignores the existence of the decision altogether. Page four of the March Letter states: "Barr has settled its patent litigation *without a decision of a court* finding the patent invalid, not infringed or unenforceable." (Pharm.'s Mot. for Prelim.Inj., Ex. 1 at 4.) (emphasis added). While subsequent ANDA applicants have challenged the tamoxifen patent, no court decisions have been rendered in those cases either. (*Id.* at 2.) Thus, according to the FDA's interpretation, Barr's 180 days of marketing exclusivity has not

yet been triggered since there is neither a court decision nor a commercial marketing of tamoxifen under Barr's ANDA. (*Id.* at 4.)

The court's analysis of whether the March Letter violates the FDCA begins with the relevant statutory text, because "the language of the statute itself is always the best indication of congressional intent." *See Abbott Laboratories,* 920 F.2d at 987. Title 21 U.S.C. § 355(j)(5)(B)(iv) states, in its entirety:

> If the ANDA contains a certification described in subclause (IV) of paragraph 2(A)(vii) [Paragraph IV certification] and is for a drug for which a previous application has been submitted under this subsection continuing such a certification, the application shall be made effective not earlier than one hundred and eighty days after—
>
> (I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
>
> (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed, whichever is earlier.

"The most basic rule of statutory construction requires that courts attribute to the words of a statute their plain meaning." *ITT World Communications, Inc. v. F.C.C.,* 725 F.2d 732, 743 (D.C.Cir.1984). Words in a statute are to be attributed their ordinary meaning, unless Congress gives them a specified or technical meaning. *See Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991); *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). In deriving a word's ordinary meaning[9], the court should follow the dictionary definition of terms, unless Congress has provided a

---

9. Courts should use well-reputed dictionaries that are contemporary with enactment of the statute. *See St. Francis College v. Al-Khazraji,* 481 U.S. 604, 610–611, 107 S.Ct. 2022, 95

L.Ed.2d 582 (1987); *MCI Telecommunications Corp. v. AT&T Co.,* 512 U.S. 218, 114 S.Ct. 2223, 2229–30, 129 L.Ed.2d 182 (1994).

specific definition. *See Pittston Coal Group v. Sebben,* 488 U.S. 105, 113, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988), *cf. United States v. Granderson,* 511 U.S. 39, 70, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (one may consult a dictionary or common sense).

Applying these concerns, this court recently determined that "a decision of a court," as used in Section 355(j)(5)(B), has a general inclusive meaning. *See Mylan 2000,* 81 F.Supp.2d at 38. Specifically, the court determined that "use of the indefinite article 'a' plainly connotes that 'a court' may refer to a district court, an appellate court, one of the two, or both." *Id.* at 37. Looking to the plain meaning of terms, there is no ambiguity in the statutory language "decision of a court" that would enable the FDA to argue that a district court decision does not trigger the 180–day period of exclusivity. *Id.* at 37. Applying the same textual analysis, this court concludes that the words "a decision of a court," used at 21 U.S.C. § 355(j)(5)(B)(iv), include a decision in the United States District Court for the Southern District of New York.

After studying the text, the court turns to consider the statutory structure, and the relationship between its language and the overall design and purpose of Hatch–Waxman. *See Mova 1998,* 140 F.3d at 1068 (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)) ("[I]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."); *Mylan 2000,* 81 F.Supp.2d at 36 (*quoting K Mart,* 486 U.S. at 291, 108 S.Ct. 1811) ("In ascertaining whether the plain language of the statute

is dispositive, 'the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.' ") Each statutory provision should be read by reference to the whole act. *See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 114 S.Ct. 517, 523, 126 L.Ed.2d 524 (1993); *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 123–24, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

This court recently determined that "[t]he structure of the statute is not at all inconsistent with according the phrase 'a decision of a court' its naturally inclusive meaning." *See Mylan 2000,* 81 F.Supp.2d at 38. This court agrees. When read in the context of the whole act, the words "decision of a court" are defined by cross-reference to other statutory provisions. First, Section 355(j)(5)(B)(iv) must be viewed in the larger context of its enabling provisions. Title 21 U.S.C. § 355(j)(4) provides as follows: "Subject to paragraph (5), the Secretary *shall approve* an application for a drug *unless* the Secretary finds [exceptions]. . . ." Paragraphs 4(A) through 4(K) list exceptions to the Secretary's mandatory duty to approve compliant ANDAs. *See Mallard v. United States District Court,* 490 U.S. 296, 302, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989). Paragraphs 5(A) through 5(D) specify additional exceptions to the Secretary's mandatory duty to approve compliant ANDAs.

Next, Section 355(j)(B)(iv) defines a court decision as "an action described in clause (iii)." Thus, Section 355(j)(B)(iv) refers the reader to Section 355(j)(5)(B)(iii). The full text of Clause (iii) is produced in the margin, and revisited as the court's discussion of the statute's language progresses.[10]

10. Clause (iii) provides:

If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii) [a Paragraph IV certification], the approval shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided

under paragraph (2)(B)(i) is received. If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reason-

Under clause (iii), approval "shall be made effective on the last applicable date determined under the following...." Clause (iii) proceeds to anticipate and provide for several real-life contingencies that could accompany a Paragraph IV-certified ANDA, including a challenge brought and later abandoned, as arguably occurred in this case.

The first contingency contemplated by and provided for by the express language of Paragraph (j)(5)(B)(iii) is the following: Barr files a Paragraph IV certification for a generic drug, and Imperial did not sue within forty-five days of that filing. The statute reads, "If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii) [a Paragraph IV certification], the approval *shall be made effective immediately unless* an action is brought for infringement...." (Emphasis added). In this case, the statute provides that Barr is entitled to 180–days of exclusive marketing immediately after the forty-five days have passed.

The second contingency anticipated by the statute is as follows: Barr files a Paragraph IV certification for a generic drug *and* a patent suit is brought by the patent holder within forty-five days, *but* no court decision is rendered. The statute provides that "[i]f an infringement action is brought before the expiration of 45 days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the *notice* provided under paragraph (2)(B)(i) or such shorter or longer period as the

court may order because either party to the action failed to reasonably cooperate in expediting the action, *except* that...." *See* 21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added). The notice referred to is the notice to the patent owner and NDA holder required under 21 U.S.C. § 355(j)(2)(B)(i)(I)–(II). The exceptions specified relate to specific decisional outcomes of a court, as described below:

(I) if before the expiration of such period the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of the court decision [("Exception # 1")],

(II) if before the expiration of such period the court decides that such patent has been infringed, the approval shall be made effective on such date as the court orders under section 271(e)(4)(A) of Title 35 [("Exception # 2")],[11] or

(III) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of such court decision. [("Exception # 3")].

*See* 21 U.S.C. § 355(j)(B)(5)(iii).

None of the exceptions would apply in the case where a patent suit was brought but no court decision was rendered. However, where no exception applies, the stat-

---

ably cooperate in expediting the action, except that—
(I) if before the expiration of such period the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of the court decision,
(II) if before the expiration of such period the court decides that such patent has been infringed, the approval shall be made effective on such date as the court orders under section 271(e)(4)(A) of Title 35,[ ] or
(III) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of

patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of such court decision.
21 U.S.C. § 355(j)(5)(B)(iii).

11. The patent infringement statute, 35 U.S.C. § 271(e)(4)(A) states: "[f]or an act of infringement described in paragraph (2) ... the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than· the date of the expiration of the patent which has been infringed."

ute clearly provides that Barr's approval shall be made effective 30 months from the time when "notice" was given to the owner of the patent and the holder of the NDA. *See* 21 U.S.C. § 355(j)(2)(B)(i)(I)–(II).

The third contingency provided for by the statute is the case where Barr files a Paragraph IV-certified ANDA, a patent *suit is brought and a court decision is rendered* within 30 months of the filing of the suit. In that case, any one of the above-mentioned exceptions could apply. If Exception # 1 or Exception # 3 applied, approval would be made effective on the date of the court decision. If Exception # 2 applied, which would mean that a court would have found that the ANDA infringed the underlying patent, then the court would assign an approval date sometime after expiration of the patent.

■ These provisions may be cumbersome and challenging to decipher, and indeed, this Circuit has observed that "Section 355(j)(5)(B)(iv) is far from a model of legislative draftsmanship." *See Mova 1998,* 140 F.3d at 1069 (D.C.Cir.1998). However, the provisions are neither silent nor ambiguous with respect to whether and when Barr's ANDA shall be approved, thereby triggering its 180–day period of marketing exclusivity. "Ambiguity of language typically appears when the draftsman does not have in mind the manner in which the norm set forth in the statute will apply to a particular situation." *See Abbott Lab.,* 920 F.2d at 989. From the plain, comprehensive and inclusive terms of 21 U.S.C. § 355(j)(5)(B)(iii) and (iv), the court discerns clear congressional intent that the draftsmen intended "a decision of a court" to mean all court decisions, whether subsequently vacated, settled, appealed or otherwise mooted. In other words, "to the extent the statute is clear about anything, it clearly forecloses" the FDA's determination to grant Barr's Peti-

tion for the reasons announced in the March Letter. *See id.*

If, for example, the agency gives effect to the Southern District decision, then the FDA could interpret the statute to mean that immediate approval applies, and the 180–day exclusivity period will have lapsed. Clause iii, Paragraph I is worth reiterating: "[I]f before the expiration of such period [30 months] the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of the court decision." *Id.*[12] If, however, the FDA ignores the Southern District decision, i.e., elects to treat the Southern District decision as though no decision occurred at all, then the interpretation violates the policy of Hatch–Waxman because the Exclusivity Incentive would never be triggered.

The court's inquiry under *Chevron* does not end with the words and structure of the statute. *See Mova 1998,* 140 F.3d at 1068. *Chevron's* plain-meaning inquiry includes an examination of the statute's language in light of the purpose of Hatch–Waxman. *See Mylan 2000,* 81 F.Supp.2d at 37. As this Circuit observed nearly a decade ago, that Hatch–Waxman struck a compromise between pioneer and generic makers, which rings true to this day:

> The statute created a new system for protecting both the interests of drug manufacturers who produce new drugs and the interests of generic drug manufacturers and their consumers. Facing the classic question of the appropriate trade-off between greater incentives for the invention of new products and greater affordability of those products, Congress struck a balance between expediting generic drug applications and protecting the interests of the original drug manufacturers.

**12.** The third paragraph of the FDA's determination is reproduced in full: Although Barr has never marketed a tamoxifen citrate product under its own ANDA, it is licensed by Zeneca Limited (Zeneca), the current owner of the [tamoxifen] patent to sell a tamoxifen product manufactured by Zeneca. Subsequent ANDA applicants have challenged the [tamoxifen] patent, but no court decisions have been issued in those cases finding the patent invalid, unenforceable or not infringed.

*See Abbott Laboratories v. Young,* 920 F.2d 984 (D.C.Cir.1990); H.R.Rep. No. 98–857 (Pt. 1), 98th Cong., 2d Sess. 14, 15, reprinted in 1984 U.S.C.A.N. 2647, 2648.

Moreover, this Circuit has observed that the legislative history of Paragraph IV is scant. *See Mova 1998,* 140 F.3d at 1072 (D.C.Cir.1998) ("The legislative history of section 355(j)(5)(B)(iv) is limited. . . .") But despite its sparse history and roots as the imperfect product of compromise, it is clear that the general purpose of Hatch–Waxman is to "provide incentives for drug companies to undertake research on new drugs while enabling low cost, generic equivalents that are relied upon by consumers to come quickly to the market." S.Rep. No. 105–36(1) at 277 (1997); *see also Abbott Lab.,* 920 F.2d at 985 (Hatch–Waxman provides an industry incentive to research and create new drugs while also responding to the public's interest in facilitating access to low-cost generic drugs).[13] Moreover, viewed against the sparse legislative history and compromise, the FDA's March Letter not only violates the plain language of the statute, but also conflicts with the purposes of Hatch–Waxman.

The statute provides that Barr's approval shall be made effective 30 months from the time when "notice" of suit was given to Imperial and Zeneca. *See* 21 U.S.C. § 355(j)(2)(B)(i)(I)–(II). But there is no language in the statute which suggests that the Exclusivity Incentive *must* follow at the end of the thirty-month period and, thereby, come to an end. According to the March Letter, if Barr cannot benefit from exclusivity, no one can. An interpretation of Section 355(j)(5)(B)(iii) that fails to give effect to the Southern District decision might, indeed, support such an interpretation because technically, Barr's Exclusivity Incentive could, but need not, start, at the end of the 30–month period. However, this interpretation is demonstrably at odds with the statute's interest in affording market access and incentives for both generic and non-generic makers.

This circuit once cautioned that in cases where the first applicant is never sued, the court-decision trigger will never be satisfied. *See Mova 1998,* 140 F.3d at 1067. Later ANDA applicants are thereby at the mercy of the first applicant's decision over when, and if, to market its product. The first applicant could wait indefinitely to begin selling its product, preventing other applicants from entering the market. *See id.* The court pointed out that this "unfortunate scenario" could happen if the first applicant "colludes with the pioneer drug company to eliminate generic competition." *Id.* at 1067. While Imperial and Barr may not have intended to "collude," the chain of events culminating with the FDA's March Letter has eliminated generic competition in the tamoxifen market. "Under these circumstances, neither party would seem to have maximum incentive" to fulfill the purposes of Hatch–Waxman. *Cf. id.* at 1072 n. 14 (stating that *amicus* brief illustrated "analogous risk, not necessarily involving collusion," which stifled the pioneer and first filer's incentive to bring litigation to a close).

Second, the FDA's March Letter precludes the possibility of competition in the tamoxifen market until 2002. Courts are advised that statutes should not be interpreted so as to create anticompetitive effects. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 2761, 120 L.Ed.2d 615 (1992). While this canon may not apply with full force when the FDA is playing in the field of compromise, the FDA's interpretation of the statute as embodied by its March Letter excessively favors Barr and Imperial's anticompetitive hold over tamoxifen. The effect of the FDA's interpretation is that from August 20, 1985, the date that Imperial was granted the tamoxifen patent, until August 20,

---

13. As articulated by Congressman Waxman, "It would be fine to say that the consumer could get the same drug at a lower price if there were generics of the new drug. But there would not be a new drug to copy if the first company did not put in the money to develop it." 130 Cong.Rec. H9124 (daily ed. Sept. 6, 1984) (remarks of Rep. Henry Waxman).

2002, the date the patent expires, the public will have access only to Imperial's version of tamoxifen, to the exclusion of any generic version of the drug. Barr and Imperial will have benefitted from exclusivity for nearly twenty years. Hatch–Waxman intended to provide an *incentive* for drug companies to explore new drugs, not a market "windfall" for crafty, albeit industrious, market players. *See Abbott Laboratories,* 920 F.2d at 989 (interpretation of the statute promoted "neither the interests of the research-oriented pharmaceutical industry nor the generic drug industry in a rational way, producing instead a windfall.")

Third, the FDA's interpretation places the decision as to whether a generic manufacturer will be entitled to exclusivity entirely in the hands of the patent holder. *See Inwood,* 723 F.Supp. at 1527. In *Inwood Laboratories,* the FDA called "absurd" the result that in some cases the delay of approval of subsequent ANDAs would never end. *See Inwood,* 723 F.Supp. at 1526. The court observed:

> This could occur ... if the first ANDA submitted never resulted in a commercial marketing because it was not approved by the FDA, *because the manufacturer was unable to bring it to market, or because the manufacturer delayed marketing in order to harm its competitors.* This last possibility is not likely because of the clear economic incentives to get the product on the market and begin enjoying the period of exclusivity as soon as possible.

*See id.* at 1527 (emphasis added). Indeed, the very absurdity alluded to in *Inwood* has come to fruition in this case. The Imperial–Barr Settlement, perhaps inadvertently, delays the approval of subsequent ANDA's by chilling the market incentive. The FDA's March Letter ratifies this outcome. There is no support in the record for the assertion that this was Congress' intent in passing the Hatch–Waxman Amendments.

For all these reasons, following the plain language of the text and attributing ordi-nary meaning to the words used, this court determines that Clause iii and Clause iv of 21 U.S.C. § 355(j)(5)(B) unambiguously apply to the Southern District decision that invalidated Imperial's tamoxifen patent, regardless of whether that decision was later vacated. Title 21 U.S.C. § 355(j)(5)(B)(iii) and (iv) are unambiguous and exceedingly precise and, moreover, intend "a decision of the court" to cover a district court decision subsequently appealed and vacated pursuant to a settlement during the pendency of the appeal. *See Commissioner v. Clark,* 489 U.S. 726, 739, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989). To conclude otherwise would be contrary to the plain meaning and purpose of these provisions. *See Mylan 2000,* 81 F.Supp.2d at 37; *see also TorPharm, Inc. v. Shalala,* 1997 U.S.Dist. LEXIS 21983 at *9 (D.D.C.1997), *vacated o.g.,* (D.D.C. 1998).

### (2) First Filer Status Violated Regulation 314.94(a)(12)(viii)

#### (a) Scrivener's Error

Barr submitted a Paragraph III ANDA for generic tamoxifen in December 1985. (Mylan's Compl. at 7; Barr's Mot. for Summ.J. at 2.) In September 1987, Barr amended its ANDA from a Paragraph III to a Paragraph IV certification, challenging Imperial's tamoxifen patent. (*Id.*) On or about March 19, 1993, and pursuant to the Settlement between Barr and Imperial's subsidiary Zeneca, Barr amended its ANDA from a Paragraph IV certification back to a Paragraph III certification. (Mylan's Compl. at 8.) To date, Barr has not submitted any further amendments to its ANDA. *Mylan* and *Pharmachemie* thus contend that Barr's application can no longer be considered to continue a Paragraph IV certification. Consequently, they argue, the March Letter, which grants Barr's Petition to stay approval of any version of tamoxifen other than Barr's, violates the plain language of Section 355(j)(5)(B). The court agrees with Mylan and Pharmachemie.

The court's analysis begins with the relevant language of the statute. *See Abbott Laboratories v. Young*, 920 F.2d 984, 987 (D.C.Cir.1990). The pertinent provision of 21 U.S.C. § 355(j)(5)(B)(iv) states:

"If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection *continuing* such a certification, the application shall be made effective not earlier than one hundred and eighty days after—

[the marketing or court decision triggers]."

*See* 21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added).

▮ Courts must follow the plain meaning of the statutory text, except when the text suggests an absurd result or a scrivener's error. *See United States Nat'l Bank of Oregon v. Independent Ins. Agents*, 508 U.S. 439, 113 S.Ct. 2173, 2186, 124 L.Ed.2d 402 (1993); *Engine Mfrs. Ass'n v. U.S.E.P.A.*, 88 F.3d 1075, 1104 (D.C.Cir.1996) (Tatel, J., concurring in part and dissenting in part o.g.) (citing U.S. *Nat'l Bank of Oregon*, 508 U.S. at 462, 113 S.Ct. 2173). A scrivener's error may be implied "where a court's reading of a portion of the statute establishes a bizarre and unprecedented regulatory regime that conflicts with other provisions of the text, undermines the statute's purpose and structure, finds no support in the legislative history, and produces a result that serves no apparent legislative purpose." *Id.* However, this court agrees that "the *sine qua non* of any 'scrivener's error' . . . is that the meaning genuinely intended but inadequately expressed must be absolutely clear; otherwise we might be rewriting the statute rather than correcting a technical mistake." *See United States v. X–Citement Video, Inc.*, 513 U.S. 64, 82, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (Scalia, J., dissenting o.g.).

Litigants who urge departure from the plain meaning of statutory language on the basis of congressional intent must shoulder a considerable burden. *See Detweiler v. Pena*, 38 F.3d 591, 596 (D.C.Cir.1994). The D.C. Circuit said in *Consolidated Rail Corp. v.. United States*, 896 F.2d 574 (D.C.Cir.1990):

As the Supreme Court has explained, "[t]he plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters. And that 'rare case' must involve, at a minimum, some clear indication of congressional intent, either in the legislative history or in the structure of the relevant statute that informs the specific language in question; any attempt less grounded in the words of the legislature itself to further what a court perceives to be Congress' general goal in enacting a statute is simply too susceptible to error to be tolerated within our scheme of separation of powers."

*Id.* (internal punctuation omitted); *see also United States v. Board of Ed. of City of Chicago*, 588 F.Supp. 132, 231 (N.D.Ill. 1984), *vacated o.g.*, 744 F.2d 1300 (7th Cir.1984) (party that argues a statute has a meaning that transcends its explicit language bears burden of showing clear legislative intent that such a contrary meaning was intended); *Kealey Pharmacy & Home Care Serv., Inc. v. Walgreen Co.*, 539 F.Supp. 1357, 1365 (W.D.Wis.1982) (party urging that statute should be read to mean something other than it appears to mean on its face bears heavy burden of persuasion).

The FDA and Barr argue that this court should interpret the word *continuing* to be *containing*, on the premise that Congress intended the word *continuing* to be *containing*. Pharmachemie responds, "[a]lthough some commenters [sic], litigants, and courts, including the *Mova* court, have suggested in passing that the word 'continuing' is likely an error, and have, like Barr, substituted the word 'containing,' they have done so without directly addressing the issue, and without citing any

extrinsic authority to support this re-writing of the words Congress chose to use in the statute." (Pharm.'s Mem. in Supp. of Mot. for Prelim.Inj. at 30.)

In support of their argument, the FDA and Barr proffer the following "extrinsic" evidence:

> The bill that Congress debated, voted on, passed, and presented to the President correctly uses the word "containing," i.e., "a previous application has been submitted under this subsection containing such a certification."

See Barr's Reply Supporting its Mot. for Summ.J. at 2 (emphasis in original); see also 130 Cong.Rec. S24970, S24972 (daily ed. Sept. 12, 1984); 130 Cong.Rec. H244216, H244260 (daily ed. Sept. 6, 1984).

The FDA and Barr have produced undisputed evidence that both the majority of the House and Senate voted, passed and presented to the President a bill that did not reference the word continuing. The FDA admits that "[a]lthough the public law version of the legislation uses the word 'continuing', FDA is not able to find any discussion of the change which suggests that it was not purposeful, but rather a mistake." (FDA's Mot. for Summ.J. at 19.) This court takes seriously the task of correcting a perceived or proven technical error in a statute:

> While literal interpretation need not rise to the level of 'absurdity' before recourse is taken to the legislative history, there must be evidence that Congress meant something other than what it literally said before a court can depart from plain meaning. In the absence of such evidence, the court cannot ignore the text by assuming that if the statute seems odd to us, i.e., the statute is not as we would have predicted beforehand that Congress would write it, it could be the product only of oversight, imprecision, or drafting error. Put otherwise, the court's role is not to 'correct' the text so that it better serves the statute's purposes, for it is the function of the political branches not only to define the

goals but also to choose the means for reaching them.

*Engine Mfrs. Ass'n v. U.S.E.P.A.*, 88 F.3d 1075, 1088–89 (D.C.Cir.1996) (emphasis added).

 The court is persuaded that FDA and Barr have demonstrated the requisite clear indication of congressional intention at odds with the text of the statute. In this case, the defendants have shown, by presenting the actual bill, "that, as a matter of historical fact, Congress did not mean what it appears to have said." *Id.* at 1089. Mylan and Pharmachemie have failed to rebut the defendants' proffer of direct evidence, by, for example, suggesting to this court that a legislative body met to further draft, compromise, debate, or otherwise intervene to change the bill. As far as the record discloses, 21 U.S.C. § 355(j)(5)(B)(iv) contains a scrivener's error. As this Circuit has repeatedly suggested, the word *continuing* was intended to be the word *containing*. *See, e.g., Purepac Pharmaceutical Co. v. Friedman,* 162 F.3d 1201, 1203 n. 3 (D.C.Cir.1998); *Mova 1998,* 140 F.3d at 1064 n. 3.

### (b) Inconsistent Application of Regulation 314.94

 Assuming then that the FDA permissibly construed the statute to accord Barr first-filer status, based on its interpretation and application of the word "containing," the court considers whether the FDA permissibly interpreted 21 C.F.R. § 314.94(a)(12)(VIII) ("Regulation 314.94").

Regulation 314.94 provides: "An applicant shall submit an amended certification by letter or as an amendment to a pending application an approved application. *Once an amendment or letter is submitted, the application will no longer be considered to contain the prior certification.*" (emphasis added). Regulation 314.94, promulgated pursuant to notice-and-comment rulemaking, has the force and effect of law, and must be applied by the agency as written. (Pharm.'s Prelim.Inj. at 20) (citing 129

F.3d at 612). As written, Regulation 314.94 prohibits the FDA from imposing a 180–day delay period because of Barr's Amendment Back. Although Barr changed its certification from a Paragraph IV to a Paragraph III certification, the agency has not interpreted its regulation to render Barr ineligible for exclusivity after the change. The FDA explains that this regulation regarding changes in patent certification "fulfills a purely administrative function." *Id.*

> In its March Letter, FDA reasons:
> This interpretation is consistent with the entire previous regulatory scheme, which was built around the "successful defense" requirement.... The removal of the "successful defense" requirement has resulted in a somewhat fragmented regulatory framework, but it has not changed the effect of this regulation. The agency recognizes that a new interpretation of Section 355(j)(5)(B)(iv), in light of *Mova [1998]* may require a new interpretation or a revision of Section 314.94(a)(12)(viii). Should the regulatory effect of a change in patent certification from a paragraph IV to a paragraph III be modified, Barr's eligibility for exclusivity may be affected.

This argument was first articulated on appeal in *Mova 1998*. Although the Secretary certainly has the authority to offer definitive interpretations of its regulations in the context of litigation, the use of a theory developed in litigation "as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties ... and on other factors relevant to the reasonableness of the Secretary's exercise of delegated lawmaking powers." *S.G. Loewendick* at 1297–98 (citing *Martin v. OSHA Review Comm'n*, 499 U.S. 144, 158, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)) (applying same principle to decision to use a citation as the initial means for an interpretation). When

first presented, this argument inspired "laughter" and jest from the appeals court.[14] Indeed, the Court of Appeals in *Mova 1998* stated, "We confess to not understanding how the FDA can reconcile its reading with the language of its own regulation, but stress that this issue has not been briefed and is not necessary to the decision in this case." *Mova 1998*, 140 F.3d at 1071 n. 13. The time has come for this issue to see its day in court. But even after the benefit of full briefing, this court continues to be baffled by the internal "housekeeping" argument.

On the one hand, the FDA is arguing that Regulation 314.94 fulfills an administrative function because of the fragmented regulatory framework. On the other hand, the FDA contends that the fragmented regulatory framework has not changed the effect of Regulation 314.94. Such internally inconsistent reasoning is inherently arbitrary and capricious and, in the absence of cogent explanation, is not entitled to deference. *See Chevron*, 467 U.S. at 837, 104 S.Ct. 2778; *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381; *General Motors Corp. v. NHTSA*, 898 F.2d 165, 174 (D.C.Cir.1998); *King Broadcasting Co. v. FCC*, 860 F.2d 465, 470 (D.C.Cir.1988). Even assuming that the FDA permissibly disregarded its formal Guidance for Industry in regulating from the "intact" Regulation 314.94, the FDA has nonetheless failed to provide a cogent explanation for why "this regulation regarding changes in patent certification fulfills a purely administrative function for the agency." (Pharm.'s Mot. for Prelim.Inj., Ex. 1.) In the absence of cogent explanation the agency's failure to follow its own regulation is fatal. *See IMS, P.C. v. Alvarez*, 129 F.3d 618, 621 (D.C.Cir. 1997) (citations omitted).

While the FDA may permissibly have interpreted Barr to be the first filer, FDA

---

**14.** Moreover, the FDA's counsel conceded that there was nothing in the language of the regulation that supports the interpretation that the regulation should apply substantively in some cases, and for internal housekeeping in others. (*See* Pharm.'s Mot. for Prelim.Inj. at 26, *citing Mova* Trans. of Oral Arg., Mar. 3, 1998, at 71–73; *Mova 1998*, 140 F.3d 1060, Ex. 18.)

58

seeks to give effect to Barr's amended paragraph IV for the purpose of triggering its entitlement to exclusivity, but then seeks to prolong Barr's exclusivity at any cost. The result is a "best of all worlds" for Barr, inconsistent with purpose of Hatch–Waxman.

### (3) Conclusion

For all of these reasons, the court determines that the FDA's March Letter is contrary to the plain meaning and purpose of 21 U.S.C. § 355(j)(5)(B). It appears from the statute that Barr's 180–day marketing exclusivity period was triggered by the Southern District decision in Barr's favor. It further appears that the 180–day period has since run, and that Barr's right to exclusive marketing under Paragraph IV has expired. The FDA's March 2, 1999 determination is vacated to the extent it violates the plain language and purpose of the statute and, accordingly, the court will remand this case to the FDA for a permissible construction of the statute.

### F. No Injunction Despite Declaratory Relief

■ Because Mylan and Pharmachemie have demonstrated that the FDA's March Letter is contrary to its plain meaning and purpose of 21 U.S.C. § 355(j)(5)(B)(iv) and Regulation 314.94, the Parties are entitled to declaratory relief. This action will be remanded to the FDA for a permissible construction of the statute. The fact that the parties are entitled to declaratory relief does not, however, lead the court to conclude that the parties have demonstrated the requisite likelihood of success that might entitle them to enjoin the FDA from imposing a 180–day delay on either of the Parties. See Mova 1998, 140 F.3d at 1066 (no injunction despite declaratory relief).

First, there is a range of permissible interpretations that the FDA may apply, and it is not clear that either party is entitled to the relief it seeks. Second, the parties are seeking not to preserve the status quo, but rather, ask this court to issue a mandatory injunction that would

"change the position of the parties." See 42 Am.Jur.2d Injunctions § 17. Requests for mandatory injunctions are reviewed with great circumspection. See Mylan 2000, 81 F.Supp.2d at 36. Moreover, "the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." Id. (quoting Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C.Cir.1969)) (internal quotations omitted).

Third, even though Mylan and Pharmachemie demonstrate a likelihood of success, the factors in the preliminary injunction analysis "interrelate on a sliding scale and must be balanced against each other." See Mylan 2000, 81 F.Supp.2d at 36 (citing Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C.Cir.1998)). The court, accordingly, considers the remaining factors of the injunction calculus. The court first assesses whether irreparable injury will befall the plaintiffs if the injunction is not granted.

### 1. Irreparable Injury If Injunction Is Not Granted

Both Mylan and Pharmachemie assert that they are being irreparably injured by FDA's refusal to grant effective approval of their tamoxifen ANDA. Specifically, both movants claim that they have been put at a competitive disadvantage in the market and have been forced to endure ongoing loss of business opportunity and market share. (Mylan's Mot. for Prelim.Inj. at 24–25; Pharmachemie's Mot. for Prelim.Inj. at 38.)

Courts in the D.C. Circuit, however, are hesitant to award injunctive relief based on assertions of lost opportunities and market share. See Mylan 2000, 81 F.Supp.2d at 42; Berman v. DePetrillo, 1997 WL 148638, *2 (D.D.C.1997) ("the loss of a business opportunity is a purely economic injury, and economic loss alone, however substantial, does not constitute 'irreparable harm'"); see also Bristol–Myers Squibb Co. v. Shalala, 923 F.Supp. 212, 221 (D.D.C.1996) (mere speculation about potential market share does not constitute

irreparable injury); *Mead Johnson Pharmaceutical Group v. Bowen*, 655 F.Supp. 53, 56 (D.D.C.1986) (purported loss of market share was "pure speculation"), *aff'd*, 838 F.2d 1332 (D.C.Cir.1988).

This court, however, has found irreparable harm where the moving party made a "strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits." *See Mylan 2000*, 81 F.Supp.2d at 42; *Express One Int'l, Inc. v. United States Postal Serv.*, 814 F.Supp. 87, 91 (D.D.C.1992) (holding that a bidder demonstrated irreparable injury where loss of 10-year $1 billion contract would cause annual loss of $130 million, would impair bidder's relationships with subcontractors and would likely cause capital costs and lay-offs of employees); *McGregor Printing Corp. v. Kemp*, 1992 WL 118794, *5 (D.D.C.1992) ("the irretrievable monetary loss ... in combination with the loss in employment to [plaintiff's] employees" amounted to irreparable harm).

Neither Mylan nor Pharmachemie (1) asserts excessive economic loss, (2) asserts claims of economic or market loss beyond that which is purely speculative or (3) claims injuries beyond economic or market-share loss. (Mylan's Mot. for Prelim.Inj. at 24–25; Pharm.'s Mot. for Prelim.Inj. at 38.) After careful consideration of the parties' pleadings and submissions, the court concludes that neither Mylan nor Pharmachemie has demonstrated that they will be irreparably injured if the injunction does not issue.

### 2. Substantial Injury to Other Interested Parties

The court next considers whether the FDA or Barr will suffer substantial injury if the injunction is granted. First, Barr benefitted substantially from its settlement with Imperial by receiving both a monetary Settlement of $21 million and distribution rights. (Mylan Response at 6–7; Pharma. Response at 6–7.) Granting the preliminary injunction need not take away any of Barr's vested benefits. Second, the Settlement was not contingent upon the non-entry of other players in the market; it was merely premised upon Barr's promise not to challenge the Imperial patent. Accordingly, if another party was granted marketing exclusivity for its generic tamoxifen, it would have virtually no effect on Barr or Barr's arrangement with Imperial. Third, Barr's contention that it will suffer the harm of irreparable injury if "wrongly denied exclusivity" is simply not persuasive. Barr waived its right to marketing exclusivity when it entered the Settlement and changed its ANDA application to a Paragraph III certification. Furthermore, Barr has not attempted to exclusively market its generic tamoxifen since the Settlement. Any injury that Barr might suffer from being denied a "head start" in its marketing of generic tamoxifen is wholly a result of its own choice to settle with Imperial. Barr cannot have its cake and eat it too. The court finds that Barr will not be substantially harmed by issuance of injunction.

However, in the event that the preliminary injunction is granted, the risk of harm to the FDA is discernible. Primarily, the FDA faces possible disruption of its processes. *See, e.g., V.N.A. of Greater Tift County, Inc. v. Heckler*, 711 F.2d 1020, 1035 (11th Cir.1983) (the court's intervention "seriously disrupts the congressionally mandated process" and in effect, tells the FDA how it should decide). Moreover, enjoining the FDA's March 2, 1999 decision would undermine the government's interest in developing permissible statutory interpretations. *Cf. United States v. Commonwealth of Puerto Rico*, 764 F.Supp. 220, 224 (D.P.R.1991) (finding that government has an interest in giving immediate force to an agency's orders and an interest in the authority and finality of agency decisions in general).

### 3. Public Interest

The public interest here is multi-faceted: (1) promoting public access to generic tamoxifen and (2) promoting industry incentives. Arguably, Zeneca has had a virtual monopoly on the tamoxifen market, to the

potential detriment of millions of women who have suffered, and continue to suffer, from breast cancer. The public may well benefit from opening the market to generic manufacturers like Mylan and Pharmachemie. But the public interest in maximizing the availability of drugs useful in the treatment of breast cancer, however compelling, must be viewed against the equally compelling, if perhaps less emotive, public interest in stimulating competition, which the statutory Exclusivity Incentive, as written, promises to do. Thus the public interest does not decisively weigh in favor of either party. The movants have failed to demonstrate that injunctive relief would best serve the public interest.

### 4. Motions For Preliminary Injunction Denied

After balancing the factors relevant to assessing the propriety of injunctive relief, the court determines that Mylan and Pharmachemie have failed to demonstrate that extraordinary relief should issue. The court, accordingly, denies their respective motions for preliminary injunction.

### V. CONCLUSION

For the reasons stated herein, the court denies Mylan's and Pharmachemie's motions for injunctive relief. Their claims for declaratory relief are, however, granted. The court vacates the FDA's March Letter to the extent it violates the plain meaning and purpose of Title 21 U.S.C. § 355(j)(5)(B) and remands the parties' remaining claims to the FDA for its permissible interpretation of the governing statute and regulation in accordance with this opinion. An Order directing the parties in a fashion consistent with this Memorandum Opinion is executed and issued this 31 day of March, 2000.

1. This court ordered Mylan's motion for preliminary injunction consolidated with the merits and treated as a motion for summary judgment on June 2, 1999.

2. This motion was originally filed as a motion for preliminary injunction. On April 13,

### ORDER

**ORDERING CONSOLIDATION OF CASES; DENYING MYLAN'S AND PHARMACHEMIE'S MOTIONS FOR INJUNCTIVE RELIEF; DENYING MYLAN'S AND PHARMACHEMIE'S MOTIONS TO INTERVENE; REMANDING TO FDA FOR PERMISSIBLE INTERPRETATION OF 21 U.S.C. § 355(j)(5)(B)(iv) AND REGULATION 314.94(a)(12)(viii)**

Upon consideration of the motions for summary judgment, applications for preliminary injunction and motions for dismissal filed in Civil Actions Number 99–862 and 99–801, the oppositions and replies filed thereto, the applicable law and the entire record in this case, and for the reasons stated in a Memorandum Opinion separately and contemporaneously executed and issued on this date herewith,

it is this 31 day of March, 2000,

**ORDERED** that Mylan Pharmaceuticals's motions for preliminary injunction filed May 12, 1999 and summary judgment filed June 8, 1999 [99–cv–862 Document 13] are **GRANTED** in part [1]; and it is

**FURTHER ORDERED** that Pharmachemie B.V.'s motion for summary judgment filed March 30, 1999 [99–cv–801 Document 22] is **GRANTED** in part [2]; and it is

**ORDERED** that the court shall **GRANT** the plaintiffs declaratory relief; and it is

**FURTHER ORDERED** that the FDA's March 2, 1999 Letter granting Barr's Petition for a Stay of Approval is **VACATED** to the extent it violates the plain language of 21 U.S.C. § 355(j)(5)(B) for the reasons

1999, the court ordered that the preliminary injunction would be treated as a motion for summary judgment. Pharmachemie filed its supplemental memorandum in support of summary judgment on September 24, 1999, and the FDA filed its opposition thereto on October 7, 1999.

stated in the Memorandum Opinion; and it is

**ORDERED** that the plaintiffs' claims are **REMANDED** to the agency for its permissible interpretation of the governing statute and regulations in accordance with the Memorandum Opinion issued contemporaneously herewith; and it is

**FURTHER ORDERED** that Barr Laboratories's motion for leave to file a consent motion for enlargement of time [99–cv–862 Document 11] is **DENIED;** and it is

**ORDERED** that Pharmachemie B.V.'s motion to intervene as a defendant in [99–cv–862 Document 20] is **DENIED;** and it is

**FURTHER ORDERED** that Defendant Shalala's motion to extend the time to answer the complaint [99–cv–862 Document 22] is **DENIED**[3]; and it is

**ORDERED** that Barr Laboratories's motion for judgment on the pleadings [99–cv–862 Document 23] is **DENIED;** and it is

**FURTHER ORDERED** that Barr Laboratories's motion for summary judgment [99–cv–862 Document 24] is **DENIED;** and it is

**ORDERED** that Pharmachemie B.V.'s motion for summary judgment in its favor against plaintiff Mylan Pharmaceuticals, Inc. [99–cv–862 Document 27] is **DENIED;** and it is

**FURTHER ORDERED** that the Defendants' motion to dismiss the complaint for lack of jurisdiction and failure to state a claim [99–cv–862 Document 28] is **DENIED;** and it is

**ORDERED** that Pharmachemie B.V.'s motion for preliminary injunction [99–cv–801 Document 3] is **DENIED;** and it is

**FURTHER ORDERED** that Barr Laboratories's motion for summary judgment [99–cv–801 Document 16] is **DENIED;** and it is

**ORDERED** that Defendants' motion for summary judgment [99–cv–801 Document 17] is **DENIED;** and it is.

**FURTHER ORDERED** that Mylan Pharmaceuticals's motion to intervene in 99–cv–801 [Document 19] is **DENIED.**

**SO ORDERED.**

---

**3.** Defendants Jane E. Henney and Donna E. Shalala filed their motion to dismiss the complaint for lack of jurisdiction and failure to state a claim on June 9, 1999.